80 Wn.2d 121 (1972)
492 P.2d 536
THE STATE OF WASHINGTON, on the Relation of Citizens Against Mandatory Bussing et al., Appellants,
v.
NORWARD J. BROOKS et al., Respondents.
No. 41912.
The Supreme Court of Washington, En Banc.
January 6, 1972.
John P. Mucklestone and James E. Kennedy, for appellants.
Christopher T. Bayley, Prosecuting Attorney, Norman K. Maleng, Assistant Chief Civil Deputy, and Michael L. Cohen, Deputy, for respondents.
NEILL, J.
Petitioners filed recall charges in King County against all seven members of the Seattle School Board. Defendants, King County election officials, refused to issue ballot synopses on the ground that the charges are not legally sufficient to support recall. Petitioners thereupon commenced this action for a writ of mandamus compelling issuance of the ballot synopses. In response, defendants assert the legal insufficiency of the charges and, as an affirmative defense, that issuance of the requested synopses *123 in the present circumstances would amount to "state action" violative of the equal protection clause of the Fourteenth Amendment.
The trial court denied the writ, concluding that the allegations of the recall charges fail to assert grounds for recall and that the allegations were fatally vague. Motions for evidentiary hearing on the affirmative defense and challenges thereto were denied without reaching the merits.
Our constitution establishes a very broad right of the electorate to recall elective public officials.[1] In compliance with this constitutional mandate, the legislature enacted
*124 RCW 29.82, which provides for the initiation of recall proceedings by
any legal voter or committee or organization of legal voters of the state or of any political subdivision thereof
by preparation of
a typewritten charge, reciting that such officer, naming him and giving the title of his office, has committed an act or acts of malfeasance, or an act or acts of misfeasance while in office, or has violated his oath of office, or has been guilty of any two or more of the acts specified in the Constitution as grounds for recall, which charge shall state the act or acts complained of in concise language, without unnecessary repetition, ...
RCW 29.82.010.
Upon presentation of such charge to the election officials it is incumbent upon them,
If the acts complained of in the charge are acts of malfeasance or misfeasance while in office, or a violation of the oath of office, as specified in the Constitution, ... [to] formulate a ballot synopsis of such charge ...
RCW 29.82.020.
[1] This court has on numerous occasions interpreted and applied these constitutional and statutory provisions. Some basic rules may be gleaned from these prior cases. First, in determining the validity of recall charges, courts are limited to examination of the charges stated and cannot inquire into factual matters extraneous to the allegations. E.g., State ex rel. LaMon v. Westport, 73 Wn.2d 255, 438 P.2d 200 (1968). Second, courts must assume the truth of the charges in determining whether legally sufficient grounds for recall have been stated. E.g., Skidmore v. Fuller, 59 Wn.2d 818, 370 P.2d 975 (1962). Third, just as there can be no inquiry into the truth or falsity of the charges, there can be no inquiry into the motives of those filing the charges. Roberts v. Millikin, 200 Wash. 60, 93 P.2d 393 (1939). Fourth, recall charges are sufficiently specific if they are definite enough to allow the charged official to meet them before the tribunal of the people. E.g., State ex *125 rel. LaMon v. Westport, supra. Finally, any one sufficient charge requires the holding of a recall election. E.g., Morton v. McDonald, 41 Wn.2d 889, 252 P.2d 577 (1953).
With this Washington concept of recall as prologue, we proceed to examine the sufficiency of the recall charges. These charges are:
(1) That acting as a member of the Board of Directors of Seattle School District No. 1, he did conspire and agree with remaining members of said Board of Directors and others, within five (5) years immediately preceeding [sic] the filing of these charges, to destroy and abandon the neighborhood public school concept, which has been in existence since the creation of said Seattle School District and relied upon by the citizens thereof, and to substitute therefor large school complexes to separate children from their families and neighborhood environments and to destroy and break down rights of parents to supervise the guidance of their children, and to make obsolete and useless existing capital improvements including school structures and facilities of said school district. He did the above acts knowing that they would require the construction of new facilities costing millions of dollars of taxpayers' money over and above the currently existing cost of making ample provision for the education of all children in said district. At public meetings of said Seattle School Board and in press releases, he willfully and knowingly misrepresented to the citizens of the school district the true nature of the above program by stating it was only a program for desegregation of the Seattle Public Schools.
(2) That, acting as a member of and in concert with other members of the Board of Directors of Seattle School District No. 1, he has knowingly and wilfully retained one Forbes Bottomly as Superintendent of said school district despite knowledge that he is unqualified to carry out the duties of such position as evidenced by the steady decline in the quality of education in said district since the appointment of said Forbes Bottomly approximately five years prior to filing this charge.
(3) Within five (5) years immediately preceeding [sic] the filing of this charge, acting as a member of, and in concert with other members of the Board of Directors of Seattle School District No. 1, he did knowingly establish *126 and officially impose segregation of students by race (dejure [sic] segregation) within said school district and particularly in the Meany and Madrona schools thereof.
(4) That on or about November 11, 1970, as a member of the Board of Directors of Seattle School District No. 1, he did conspire with the remaining members of the school board and with others to transfer approximately 600 white students from their established attendance areas of Lincoln and Roosevelt High Schools to the remote Garfield High School attendance area for the 1971-1972 school year, and thereafter to effect massive student transfers throughout the entire school district. The race of the students was the criterion used to determine which students in the school district would be transferred and which schools they would attend, contrary to the Constitution of the State of Washington.
(5) That on or about November 11, 1970, as a member of the Board of Directors of Seattle School District No. 1, he did conspire and agree with the remaining members of said Board of Directors and with others to transfer approximately 600 non-white students from their established attendance areas of the Garfield High School area to the remote Lincoln and Roosevelt High School attendance areas for the 1971-1972 school year, and thereafter to effect massive student transfers throughout the entire school district. The race of the students was the criterion used to determine which students in the school district would be transferred and which schools they would attend, contrary to the Constitution of the State of Washington.
(6) That on or about November 11, 1970, as a member of the Board of Directors of Seattle School District No. 1, he did conspire and agree with the remaining members of said board and with others to provide school transportation only for students participating in the mandatory transfer program between the Lincoln and Roosevelt areas and the Garfield area of said school district, and to deny other students equal treatment with regard to providing school transportation during the 1971-1972 school year.
(7) That on or about November 11, 1970, acting as a member of the Board of Directors of Seattle School District No. 1, he did conspire and agree with remaining members of said Board of Directors to abdicate their *127 duty to exercise their best and honest judgment with regard to the budget and cost of a program of student transfers between schools in said school district for the 1971-1972 school year.
We will treat these charges in two general groups: those which pertain to the proposed school desegregation and bussing program, and those which do not purport to have that reference. As to the first group of charges, we believe the recent case of Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 28, 28 L.Ed.2d 554, 91 S.Ct. 1267 (1971), has controlling significance. In that case, the court upheld a court-ordered desegregation plan which incorporated mandatory bussing in a "Southern" school district which was infected with "de jure" racial segregation.[2] The court said:
The remedy for such segregation may be administratively awkward, inconvenient and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the *128 interim period when remedial adjustments are being made to eliminate the dual school systems.
In a companion case, the court rejected the notion that school authorities cannot consider the race of students in formulating and implementing desegregation plans:
Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems.
North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 28 L.Ed.2d 586, 589, 91 S.Ct. 1284 (1971).
Although the Swann court rather clearly limited the authority of federal courts to impose desegregation plans on school authorities to situations involving "de jure" dual systems, that court also observed (Swann, 402 U.S. at 16):
School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; ...
[2] Petitioners argue that these federal precedents have no application in this case because any segregation in the Seattle schools is "de facto" and thus beyond the purview of those cases. We disagree. For our present purpose of testing the sufficiency of recall charges, the nature of segregation within Seattle schools as "de facto" or "de jure" is of no consequence. Reason impels the conclusion that, if the constitution supports court directed mandatory bussing to desegregate schools in a system which is dual "de jure," then such bussing is within the appropriate exercise of the discretion of school authorities in a system which is dual "de facto." In this connection, it is important to note that *129 the recall charges do not attack particulars of the bussing plan. Rather, they are leveled against the enactment of such a plan per se, with alleged consequences which could be asserted as to any mandatory bussing plan. Assuming such charges are true, they do not charge misfeasance, malfeasance or violation of the oath of office. Accordingly, the trial court is affirmed as to charges numbered 1, 4, 5, 6 and 7, which relate to a mandatory bussing plan. Charges 4 and 5 are directed at the bussing plan per se, and charges 1, 6 and 7 attack purported "awkwardness and inconvenience" and "burdens" (Swann v. Charlotte-Mecklenburg Bd. of Educ., supra) of the plan.
[3] The remaining charges do not, on their face, have reference to the bussing plan. Charge 2 asserts that the school board members knowingly and willfully retained an unqualified superintendent of the school district "as evidenced by the steady decline in the quality of education in said district." In State ex rel. LaMon v. Westport, 73 Wn.2d 255, 438 P.2d 200 (1968), and Morton v. McDonald, 41 Wn.2d 889, 252 P.2d 577 (1953), charges of employing officials known to be incompetent were held to be legally sufficient for recall purposes. On its face, charge 2 is also legally sufficient, assuming its truth, to support recall. The trial court erred in ruling this charge insufficient on the grounds that the facts of the case do not bear it out. The charge may ultimately prove to be unfounded, even frivolous, but courts are not empowered to make that determination. E.g., Skidmore v. Fuller, 59 Wn.2d 818, 370 P.2d 975 (1962). Defendants' reference to the statute and rules setting forth qualifications for obtaining the office of superintendent is of no avail here, since the charge does not pertain to eligibility, but to performance while in office. As a majority of this court is unwilling to overrule the Westport and Morton cases as to what constitutes "misfeasance, malfeasance or violation of oath of office," we must hold that charge 2 states a legally sufficient allegation.
We turn to the legal sufficiency of the remaining charge, charge 3. Here, the parties engage in an interesting turnabout. *130 Petitioners assert that the school board members knowingly and officially established and imposed "de jure" racial segregation within the school district, specifying two schools in particular. Defendants argue that "de jure" segregation requires some legal mandate or color of law; that the charge is not legally sufficient since it fails to specify such a mandate.
[4, 5] Defendants' argument on this point has lost efficacy in light of the United States Supreme Court's decision in Swann v. Charlotte-Mecklenburg Bd. of Educ., supra. We find, in the language of Swann, the essence, if not the express existence of a rule expanding the meaning of the term "de jure segregation" to comprehend any situation in which the activities of school authorities have had a racially discriminatory impact contributing to the establishment or continuation of a dual system of schools, and a corresponding limit on the meaning of "de facto segregation" to include only that which is inadvertent and without the assistance or collusion of school authorities.[3] The formality of a legal mandate is no prerequisite. The charge states a violation of constitutional rights and, if true, would support recall.
*131 Although charge 3 seems somewhat dissonant in company with other charges against the school board members pertaining to their bussing plan, we reiterate the rule that the truth and consequence of a recall charge are matters to be determined by the people, not the courts. E.g., Skidmore v. Fuller, supra. Furthermore, we are of the opinion that this charge, in specifying that the act complained of was "official" and in particularizing two schools involved, was sufficiently definite. See State ex rel. LaMon v. Westport, supra.
The trial court indicated that, should any charge be found legally sufficient, defendants would be entitled to an evidentiary hearing on their assertion that the recall campaign is for the purpose of blocking desegregation and that issuance of a ballot synopses would constitute "state action" violative of the equal protection clause. With reference to charges numbered 2 and 3, defendants' argument is unconvincing. Neither charge has any express relevance to the bussing plan and there is nothing intrinsic therein which would have a discriminatory effect. Of course, the recall process is not invalid state action per se.
[6] Defendants cite Reitman v. Mulkey, 387 U.S. 369, 18 L.Ed.2d 830, 87 S.Ct. 1627 (1967), and similar cases to support their position that a political process, such as recall, cannot be used to thwart Fourteenth Amendment rights. Those cases involved attempts to use state processes for immediately discriminatory objectives, such as repeal of open housing (Reitman v. Mulkey, supra) or rescission of a desegregation plan (Keyes v. School Dist. 1, 303 F. Supp. 279 (Colo. 1969)). See also North Carolina State Bd. of Educ. v. Swann, supra ("anti-bussing" statute). Here, as to charges 2 and 3, there is no such immediate objective and effect, and such a purpose can only be gleaned from an investigation of the personal motives of the petitioners. Such inquiry is not proper in recall cases. Roberts v. Millikin, supra. Furthermore, to accept defendants' contention on this point would allow officials subject to legally sufficient recall charges to take refuge in the fact that recall *132 may have a discriminatory effect, even though that effect is unrelated and incidental to the recall itself. Such a severe limitation on the right of the people to recall elected officials is not required and is not in keeping with the broad concept of the right of recall contained in our constitution.
Affirmed as to charges 1, 4, 5, 6 and 7. Reversed as to charges 2 and 3, and remanded for proceedings in accordance herewith.
HAMILTON, C.J., FINLEY, ROSELLINI, STAFFORD, and WRIGHT, JJ., and RYAN, J. Pro Tem., concur. HALE, J. (concurring in part; dissenting in part)
This is not a school segregation, Fourteenth Amendment equal protection case but an election case. To begin at the right place, therefore, we should look to the state constitution to find out if the people have reserved a political right to recall the Seattle School Board for the reasons asserted. If they did reserve that right, then the election must be held; if not, then all else is but sound and fury, signifying nothing.
In my judgment, the people wrought better than the court allows when they adopted the eighth amendment to the state constitution. The amendment rests upon what seems to be the sound proposition that, in the long run, the people are capable of governing themselves; that they know or will ultimately learn what is the best course to take and that, if mistakes must be made, they reserve for themselves the primary right to make them. The Eighth Amendment was and is one of a trinity of devices, along with the initiative (Const. art. 2, § 1 (a)) and the referendum (Const. art. 2, § 1 (b)), designed to insure insofar as political institutions and popular political genius permits, a fair measure of self-government during an era when, for nearly a century, there have developed seemingly inexorable forces tending to remove the powers of government farther and farther from the governed. To test this assertion, one need only ask whether any except professional *133 politicians would seriously advocate repeal of the initiative, referendum and recall.
The point to be reemphasized here, therefore, is that this is a recall election matter and not a school segregation, Fourteenth Amendment equal protection case. Whether the Seattle School Board has carried out its responsibilities in the field of racial desegregation is not before us; but whether the recall petitions meet the requirements of the eighth amendment to the state constitution is. If the petitions satisfy the recall amendment, then the county election officials must perform their more or less ministerial functions (Claussen v. Peddycord, 69 Wn.2d 224, 417 P.2d 953 (1966)), prepare a ballot synopsis, and put on an election. If the recall charges do not meet the requirements, then that is the end of the matter.
The court strikes down charges 1, 4, 5, 6 and 7 of the recall petitions on the assumption that they do no more than assert that the Seattle School Board should be punished by recall for discharging its duties under the fourteenth amendment to the United States Constitution. Thus, the opinion suggests that no recall petition will lie which purports to take issue with any plan of compulsory bussing of school children on account of their race. This rather curious conclusion is reached despite the fact that this is not a Fourteenth Amendment case nor a school desegregation bussing case nor any other kind of a case except one to decide if the recall petitions are legally sufficient under the eighth amendment to the state constitution and whether the county election officials are obliged to issue a ballot synopsis.
The state constitution accords to the courts no special powers either to endorse or to repudiate the Seattle School Board in the discharge of its office. Whether the board members carried out their offices superbly and with great dedication and industry or poorly and with indifferent competence is none of this court's affair in the case before us. Nor are we concerned with the motives of those who would recall the board  whether they acted from a high sense of *134 devotion to the public service and nobility of purpose, or from ignorance, malice, ill will or envy, or simply to create vacancies in public office so as to make these offices available to the recall sponsors and their allies. These considerations, too, under the state constitution, are no affairs of the court in a case of this kind. Nor are we empowered to examine into and ascertain whether the charges are wholly true, wholly false, or partly either  for this, too, is no concern of this court. The people have created another tribunal to decide all of these things  the tribunal of the ballot box. As we said earlier, in Cudihee v. Phelps, 76 Wash. 314, 136 P. 367 (1913) at 330:
The people, speaking in the manner provided by law, may discharge their public officers for any cause, or without any cause, as their laws may provide. Indeed, the people's rights are as complete in that respect as when they choose such officer. In other words, as against the people, a public officer, their servant, has no rights whatever, so far as his possession of the office is concerned, which may not be ignored by the people speaking in a lawful manner. While it seems true that, under this constitutional provision, an officer is to be removed for cause only; yet, the question being purely a political one, unless expressly provided otherwise by statute or constitution, it is manifest that the tribunal before which the sufficiency of the cause is to be tried is that of the people. It may be that the courts have jurisdiction to determine the sufficiency of the statement of the allegations made as cause for removal if presented in a proper proceeding involving the question of the calling of the election, but the trial of the question of whether such cause actually exists, and as to whether the officer shall be discharged, is to be had before the tribunal of the people and decided by them at the polls.
Under the recall amendment, therefore, this court is not concerned with and should not inquire into the motives of the sponsor of the recall movement, nor examining the truth or falsity of the charges upon which the recall depends, nor weigh the motives of the sponsors of the recall or the electors in voting to recall or retain the public officers against whom the recall is directed, or whether, in *135 case of recall, their successors will be a superior lot to those recalled.
We repeated that statement in Roberts v. Millikin, 200 Wash. 60, 67, 93 P.2d 393 (1939), where a state senator was charged in recall petitions with agreeing, in exchange for the votes of other state senators on measures he favored, to vote for a bill to which he was in principle opposed. Holding that this conduct sufficiently charged malfeasance and referring to the above quotation from Cudihee v. Phelps, supra, this court said:
Now, if the courts are without power to inquire into the truth of the charges, they are, with much greater reason, without power to inquire into the motive of the persons filing the charges.
As the court in the instant case says, we have never departed from any of these principles in a long line of decisions.
Our only concern in this case, therefore, is whether the charges are legally sufficient to meet the requirements of the recall amendment (Const. art 1., § 33). Do they describe conduct in office that can reasonably be said to amount either to malfeasance or misfeasance while in office, or violation of oath of office? As to the oath of office, a school director pledges to support the federal and state constitutions and "to faithfully discharge the duties of his office according to the best of his ability." RCW 28A.57.322 (formerly RCW 28.58.095). Accordingly, if the recall charges describe with reasonable definiteness conduct in office either amounting to malfeasance or misfeasance or failure to discharge the duties of school director to the best of one's ability, they must be held good and the people allowed to vote them up or down.
Each of the charges here, I think, describes conduct in office constituting either malfeasance or misfeasance or violation of oath  either separately or in combination. Malfeasance means the doing of an act that is unwarranted; an act one has contracted not to do; that is legally unjustified, or positively wrongful or contrary to law, whereas misfeasance *136 is the performance of a lawful action in an illegal or improper manner. Both terms imply wrong or improper conduct in public office. Merriam-Webster Third Int'l Dictionary (1964). As to violation of oath, that term embodies any action or inaction or acts or omissions amounting to a failure to discharge the office of school director to the best of one's ability. In stating the charges for purposes of recall, one thing is certain. None of the misconduct or inaction charged  while it may do so  needs amount to a crime or a direct violation of a statute, in order to constitute either malfeasance, misfeasance or violation of oath of office. Thiemens v. Sanders, 102 Wash. 453, 173 P. 26 (1918).
I agree that malfeasance, misfeasance and violation of oath mean misconduct amounting to more than mere irregularity (43 Am. Jur. Public Officers § 195 (1942)), but a reading of the charges seriatim in this case will, I think, show that these deleted charges assert much more than mere irregularity. Charge No. 1, inter alia, says that board members conspired to "destroy and break down rights of parents to supervise the guidance of their children" and to waste public money by making existing school buildings and facilities obsolete and that they intentionally misrepresented this process as a means of achieving racial desegregating of the schools. These charges, I think, charge malfeasance, misfeasance and violation of oath.
There is little difference beween this charge and charge No. 3 as upheld by the court. Thus, a reasonable reading of charge No. 3 will lead one to conclude that it says that board members, acting in concert with other members, imposed racial segregation within the district, and particularly in the Meany and Madrona schools. Racial segregation is wrong, I believe, and to assert it charges either malfeasance or misfeasance or violation of oath, and probably all three.
Charges Nos. 4 and 5 similarly say that the board members conspired with the other members of the board to compel 600 white children to transfer their attendance *137 from their own nearby high schools to those across town, solely because of their race and for no other reasons. This charge, too, raising as it does an unmistakable claim of racial discrimination, should be held sufficient to be voted upon.
Whether the asserted actions of the board in ordering selective compulsory bussing were designed to curtail racial segregation in the schools, or, if carried out, will have a salutary effect on racial integration does not affect the legal sufficiency of the charges. Those are questions to be decided by the voters when validly put to them  or by a court of competent jurisdiction at another time. Since the court cannot under the constitution look beyond the face of the charges to test their sufficiency, it should not give legal effect to a defense which under the constitution must be presented only to the voters.
Charge No. 6, while possibly repetitious of charges 4 and 5 with respect to mandatory racial segregation, goes further to say that in practicing racial discrimination the board also denied children equal transportation privileges on account of their race; and charge 7 says that the board members did conspire and agree with the other members not to use their honest and best judgment in providing the budget and expenses for student transportation by bus during the 1971-72 school year. If failure to use both honest and best judgment when making up the budget and calculating the costs of a school program does not charge malfeasance or misfeasance or violation of oath, I do not know what conduct, short of charging a serious crime, does do so.
At the risk of being repetitious, it should be said that accusations may be wholly false, maliciously inspired and malevolently stated. But we are not the judge of that. The people are the judges both of the truth of the accusations and the motives which inspired them. So final and all conclusive and so broad is the discretion vested in the electorate by the state constitution that the people might well believe the charges true, and yet in their analysis and balancing of the equities nonetheless elect to retain the *138 board in office. Or believing them false, vote the recall.
This court has steadfastly held to the rule that, if the charges assert wrongful acts or substantial misconduct, then it is the people and not the courts who make the decision. Thus, in Cudihee v. Phelps, 76 Wash. 314, 330-31, 136 P. 367 (1913), we said:
[U]nder this constitutional provision, an officer is to be removed for cause only; yet, the question being purely a political one ... it is manifest that the tribunal before which the sufficiency of the cause is to be tried is that of the people.... [T]he truth of the charges upon which the officer is sought to be recalled is triable before the people rather than before the courts.
Vote swapping, as earlier noted, although completely legal, without regard to the merits of the issues under consideration, was considered sufficient misconduct to permit the people to judge it in a recall election. Pybus v. Smith, 80 Wash. 65, 141 P. 203 (1914); Roberts v. Millikin, 200 Wash. 60, 93 P.2d 393 (1939). This court has stood foursquare upon the proposition that, if the recall charges describe "any wrongful conduct that affects, interrupts, or interferes with the performance of official duty," it is conduct amounting to malfeasance or misfeasance or violation of oath of office and is sufficient ground for recall. Danielson v. Faymonville, 72 Wn.2d 854, 435 P.2d 963 (1967). I would stay with that rule.
Therefore, I concur that charges 2 and 3 are sufficient, but I would go further and hold the others are likewise sufficient to constitute grounds for recall.
NOTES
[1] The Washington Constitution states:

"AMENDMENT 8
"Art. 1 was amended by adding the two following sections:
"§ 33 RECALL OF ELECTIVE OFFICERS. Every elective public officer of the state of Washington expect [except] judges of courts of record is subject to recall and discharge by the legal voters of the state, or of the political subdivision of the state, from which he was elected whenever a petition demanding his recall, reciting that such officer has committed some act or acts of malfeasance or misfeasance while in office, or who has violated his oath of office, stating the matters complained of, signed by the percentages of the qualified electors thereof, hereinafter provided, the percentage required to be computed from the total number of votes cast for all candidates for his said office to which he was elected at the preceding election, is filed with the officer with whom a petition for nomination, or certificate for nomination, to such office must be filed under the laws of this state, and the same officer shall call a special election as provided by the general election laws of this state, and the result determined as therein provided.
"§ 34 SAME. The legislature shall pass the necessary laws to carry out the provisions of section thirty-three (33) of this article, and to facilitate its operation and effect without delay: Provided, That the authority hereby conferred upon the legislature shall not be construed to grant to the legislature any exclusive power of lawmaking nor in any way limit the initiative and referendum powers reserved by the people. The percentages required shall be, state officers, other than judges, senators and representatives, city officers of cities of the first class, school district boards in cities of the first class; county officers of counties of the first, second and third classes, twenty-five per cent. Officers of all other political subdivisions, cities, towns, townships, precincts and school districts not herein mentioned, and state senators and representatives, thirty-five per cent."
[2] The scope of the term "de jure" is not limited by geography or by the concept of an express provision of law. Segregation, to be invidious, need not be blatant. The constitution, as elucidated by Brown v. Board of Educ., 347 U.S. 483, 98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180 (1954), and its progeny, especially the most recent cases, outlaws racial discrimination in school systems which is the result of discriminatory action by school authorities, with or without other state action. "Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race ..." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 28 L.Ed.2d 554, 570, 91 S.Ct. 1267 (1971). Indicia of such a "de jure" system include factors in addition to student assignments within the school district in question, such as: "existing policy and practice with regard to faculty, staff, transportation, extracurricular activities, and facilities" (Swann, 28 L.Ed.2d 568). "In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is ... a factor of great weight." (Swann, 28 L.Ed.2d 569). If, in fact, such a racially discriminatory system is found to exist, then school authorities have the affirmative duty to take any necessary steps to convert to a system which is unitary not just in form but "in which racial discrimination would be eliminated root and branch." (Swann, 28 L.Ed.2d 566, quoting Green v. County School Bd., 391 U.S. 430, 437-38, 20 L.Ed.2d 716, 88 S.Ct. 1689 (1968).
[3] Accord: Johnson v. San Francisco Unified School Dist., 339 F. Supp. 1315 (N.D. Cal., July 9, 1971).

The Swann court expressly put aside any question as to the effect in this area of state action not involving any discriminatory action by school authorities. 28 L.Ed.2d 554, 570. However, in the companion case of North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 45, 28 L.Ed.2d 586, 589, 91 S.Ct. 1284 (1971), the court met this question in significant part. In striking down a state "anti-bussing law," the court said:
We observed in Swann, supra at 16, that school authorities have wide discretion in formulating school policy, and that as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements. However, if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.
See also Keyes v. School Dist. 1, 303 F. Supp. 279 (Colo. 1969).