[No. 42106. En Banc. April 6, 1972.]

CITIZENS AGAINST MANDATORY BUSSING et al., *Respondents*, v. EDWARD P. PALMASON et al., *Appellants*.

446

*Gary M. Little, Ashley, Foster, Pepper & Riviera,* and *Camden M. Hall,* for appellants.

*John P. Mucklestone* and *James Edward Kennedy,* for respondents.

*Slade Gorton, Attorney General, Gerald L. Coe* and *William E. Cullen, Jr., Assistants,* and *Arthur E. Piehler,* amici curiae.

HALE, J.—The questions before the court in this case are: What is the proper scope of judicial review of a decision of school directors, selecting a method of alleviating de facto segregation in the district's schools? and, Within that scope of review, was the Superior Court for King County justified in enjoining the implementation of the plan which was adopted by directors of Seattle School District No. 1 on November 11, 1970?

In *State ex rel. Citizens Against Mandatory Bussing v. Brooks,* 80 Wn.2d 121, 492 P.2d 536 (1972), an action to compel a recall election, this court held that a decision of the Board of Directors of Seattle School District No. 1, whereby it adopted a plan for the desegregation of schools

within the district, beginning in the year 1971 with the desegregation in certain schools of grades five through eight, was within the lawful exercise of the discretion lodged in that board by statute. In doing so, we applied the principles which were laid down in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971).

The plan in question involves the assignment of students to schools other than those which they would attend were they assigned to what are commonly designated "neighborhood schools."[1] The plantiffs who brought that action, a group of parents living within the district and a corporation which they have formed to oppose this announced policy of the school directors, also sought in this action to restrain the school directors from implementing the policy.[2] They obtained an injunction in superior court restraining the implementation for 1 year, for the purpose of allowing the plaintiffs to study the plan and offer alterna-

---

[1] The number of students to be transferred in this initial phase of the plan was between 850 and 1,000.

[2] The action was allegedly brought under the authority of RCW 28A.88, which provides for a review de novo of decisions or orders of any school official when an appeal is taken to the superior court by a person or persons aggrieved by that order. The defendants have not questioned the right of the plaintiffs to utilize the procedure set forth in this statute to enjoin the discretionary acts of school officials, but did raise in the trial court the question whether the act empowered the court to review the wisdom of a legislative or administrative, as opposed to a judicial act of school officials. This court has held that, where a power exercised by a state agency is essentially administrative, judicial review will be limited to a consideration of whether the agency acted arbitrarily, capriciously or contrary to law, even though a statute authorizes a review de novo in the superior court. *In re Harmon,* 52 Wn.2d 118, 323 P.2d 653 (1958). The right to use the procedure for appeals from decisions of school officials to question the wisdom of administrative actions was apparently raised by the defendants in the case of *State ex rel. Lukens v. Spokane School Dist. 81,* 147 Wash. 467, 266 P. 189 (1928), but this court found it unnecessary to decide that question. We also pass the question and will treat the action as one for an injunction, which it is in its present posture, limiting the scope of our review by the rule which we have previously laid down in *State ex rel. DuPont-Fort Lewis School Dist. 7 v. Bruno,* 62 Wn.2d 790, 384 P.2d 608 (1963).

tives. The court did not find that the defendant school directors had no authority to adopt the plan, but merely concluded that they "made a mistake," an unwise policy decision, in deciding to put the plan into operation in the fall of 1971. The defendants have appealed.

The plaintiffs have not taken a cross-appeal from the denial of a permanent injunction, and therefore the sole question before us is whether the trial court erred in enjoining the defendants from proceeding to implement their plan before the fall of 1972.

 The question involves the proper scope of review of an administrative act of a school district which is not of a judicial character. The court has a broader role to play in reviewing administrative acts which are of a judicial nature[3] than it has where the act in question is of a legislative character, or one which involves the exercise of discretion in selecting a method of effectuating, at the local level, a policy announced by the legislature, as was the decision in this case. See 2 F. Cooper, State Administrative Law 668 (1965).

In the case of State ex rel. DuPont-Fort Lewis School Dist. 7 v. Bruno, 62 Wn.2d 790, 384 P.2d 608 (1963),[4] we reviewed our prior cases in which the question of the proper scope of review of nonjudicial administrative decisions had been considered, and concluded that such decisions can be examined to determine whether they violate

---

[3]Various tests have been applied to determine whether an action is judicial in nature. See Okanogan County School Dist. 400 v. Andrews, 58 Wn.2d 371, 363 P.2d 129 (1961). Generally, if the function performed by the agency is one which courts have traditionally performed and which the courts could have performed in the first instance, it is a judicial function. In re Harmon, supra note 2. Under any test, the action of the school directors in this case was nonjudicial, and this fact is not disputed.

[4]See also State ex rel. Gebhardt v. Superior Court, 15 Wn.2d 673, 131 P.2d 943 (1942), an injunction action brought against school directors, holding that courts will not, by injunction, interfere with the exercise of discretionary powers bestowed upon officers of a municipal corporation merely because they may be unwise, extravagant or a mistake of judgment. And see, in accord, Group Health Cooperative v. King County Medical Soc'y, 39 Wn.2d 586, 237 P.2d 737 (1951).

some fundamental right of the party challenging them. In that case we held that a school district has no substantive right to accreditation upon meeting certain standards and that, consequently, the propriety of an order of the state superintendent denying accreditation to the plaintiff in that action was not subject to review.

■ What fundamental rights do the plaintiffs claim were violated by the defendants' action in this instance? We first take note of rights which they do not claim, but which the trial court apparently assumed to exist when it entered its restraining order. The trial court in its memorandum opinion indicated that the school directors should have delayed the implementation of the plan long enough to allow the plaintiffs to invoke the referendum process. The notion that administrative decisions of school district officers are subject to revision by referendum is a novel one in the law, and the plaintiffs do not contend otherwise. The invoking of such a procedure would enable the voters of any community to frustrate the purpose of Const. art. 9, § 1, which provides that

> [i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex.

and of section 2 thereof, which provides that the legislature shall provide for a general and uniform system of public schools. It was in compliance with this mandate that the legislature enacted those laws contained in RCW 28A.

As we said in *Edmonds School Dist. 15 v. Mountlake Terrace,* 77 Wn.2d 609, 465 P.2d 177 (1970), the state exercises its sovereign powers and fulfills its duties of providing education largely by means of a public school system under the direction and administration of the State Superintendent of Public Instruction, State Board of Education, school districts and county school boards.[5]

---

[5]The plan in question was approved by the State Superintendent, we are informed in a brief filed in his behalf by the Attorney General. It also was approved, according to briefs on file with the court, by the

■ Initiative and referendum procedures can be invoked at the local level only if their exercise is not in conflict with state law. *State ex rel. Guthrie v. Richland,* 80 Wn.2d 382, 494 P.2d 900 (1972). Clearly they cannot be used to interfere in the management of the state's school system.

Another thought which the trial court apparently had in mind was that the plaintiffs should have been given sufficient notice of the school directors' plans to enable them to prepare and submit alternative plans of their own. We do not think the court actually conceived that the plaintiffs had a statutory or other legal right to submit plans, but rather it was of the opinion that the directors exercised poor judgment in not giving them an opportunity to do so.

To support the trial court's conclusion, the plaintiffs cite cases which hold that, *if hearings are required,* they must be fair. *State ex rel. York v. Board of County Comm'rs,* 28 Wn.2d 891, 915, 184 P.2d 577, 172 A.L.R. 1001 (1947), is typical of these cases. There we said:

> We think it correct to say that, when the statute prescribes no mode of inquiry, an administrative agency is impliedly authorized to use any procedure that is reasonable in attaining the end in view. If a hearing is required, it must be adequate and fair.

■ The statutes do not require that the school board hold hearings[6] before making a decision of the sort involved here, consequently the first sentence of the above quotation is applicable. The school board was impliedly authorized to use any procedure which was reasonable in

State Board of Education and the Washington State Human Rights Commission (*see* RCW 49.60 for the functions and authority of this commission).

[6]The defendants were required by Laws of 1953, ch. 216, § 1, to hold open meetings. The plaintiffs suggest that the action taken on November 11, 1970, was invalid because the matter had been considered in executive session. However, executive sessions were expressly authorized. *See* Laws of 1953, ch. 216, § 2. Furthermore, the plaintiffs do not point to any language of that act which invalidates an action taken in executive session.

attaining the end in view. The evidence showed that the board studied many plans and considered many opinions of experts and laymen before reaching its decision, and that it voluntarily held hearings and urged parents and other members of the public to come and give their views. We are not told that the plaintiffs ever submitted a plan for desegregation, nor do they claim that they were denied a right to do so. We find no basis in the law for the proposition that the plaintiffs had a right to have any plan that they might propose considered, but we assume that the board would have given such a plan due consideration had one been submitted during the years it was searching for a solution to the problem of segregated schools.[7]

A system of voluntary transfers of students had been tried. The statistics show that this method would not accomplish the objective. Even so, the trial court could find before it no other alternative plan which might accomplish that objective. The plaintiffs do not propose here, nor can we find that they have proposed elsewhere, a practical effective alternative to the plan which was adopted by the board.

We think the procedure followed by the board was a reasonable one, by any definition of that term. The fact that the trial court thought that the board was unwise in deciding to implement the plan immediately after its adoption was not a basis for ordering a delay. The court's conclusion was addressed to the wisdom of the board's action. The order based upon that conclusion amounted to nothing less than a substitution of the court's discretion for that of the school board, the body authorized by law to make the particular decision in question and to decide how and when to implement it. Unless the plaintiffs are able to show some other basis for sustaining it, it must therefore be reversed.

■ What do they offer? In both actions, the plaintiff parents have placed great reliance upon a theory that they have a right to send their children to neighborhood schools.

---

[7]The problem had been under study for at least 7 years, according to the findings.

While we think that the existence of such a right is inconsistent with the holding of the United States Supreme Court in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971), followed by this court in *State ex rel. Citizens Against Mandatory Bussing v. Brooks*, 80 Wn.2d 121, 492 P.2d 536 (1972), we will examine that theory, since it can be said that it amounts to the assertion of an alleged fundamental right.

In its findings, the trial court spoke of a right to send children to neighborhood schools. The plaintiffs insist that they have such a right, that it is in the nature of a property right, that it is vested, and that it was an "abuse of discretion" to take it away from them by ordering reassignment of students. They cite no authority which supports their theory, however.

It is true that, as long as the school board authorized or required students to attend schools geographically situated close to their homes, they had such a right. But the right existed only because it was given to them by the school authorities. Axiomatically, the authority which gives the right may take it away.

 It is fundamental that no one can have a vested right in any general rule of law or policy of legislation which entitles him to insist that it remain unchanged for his benefit. *State ex rel. Washington State Sportsmen's Council, Inc. v. Coe*, 49 Wn.2d 849, 307 P.2d 279 (1957); *Overlake Homes, Inc. v. Seattle-First Nat'l Bank*, 57 Wn.2d 881, 360 P.2d 570 (1961).

The general rule is that no one has a vested right to be protected against consequential injuries arising from a proper exercise of rights by others. This rule is especially applicable to injuries resulting from the exercise of public powers. *Pacific Inland Tariff Bureau v. Schaaf*, 1 Wn.2d 210, 95 P.2d 781 (1939). In that case we quoted with approval the following from 2 T. Cooley, Constitutional Limitations 795 (8th ed. 1927):

It is a general rule that no one has a vested right to be protected against consequential injuries arising from a

proper exercise of rights by others. This rule is peculiarly applicable to injuries resulting from the exercise of public powers. Under the police power the State sometimes destroys, for the time being, and perhaps permanently, the value to the owner of his property, without affording him any redress.

(Footnote omitted.)

In the case of *State ex rel. Lukens v. Spokane School Dist. 81,* 147 Wash. 467, 471, 266 P. 189 (1928), where the school directors proposed to change the location of a school, a similar vested right was claimed. The plaintiffs alleged:

That many people have built homes, improved their lands and yards, established residences and maintained places of business with reference to the old school site as being permanent, which has become a vested right, the violation of which will deprive petitioners of their property without due process of law.

This court said of the contention:

No law is cited nor reason given for the argument and we know of none that courts will apply. The judgment of public authorities in the matter of the location and change of location of public buildings will not be interfered with by the courts upon such considerations.

We find no authority in law for the proposition that parents have a vested right to send their children to, or that children have a vested right to attend, any particular public school.

The fact that the plaintiffs are convinced that their children would derive peculiar advantages from attending "the school of their choice" but would suffer a disadvantage in attending another public school points up very clearly the problem facing the school board as a result of which it determined that in Seattle's public schools, there has not been an equal educational opportunity. After studying the problem the board concluded that the situation could be remedied best by adopting the plan in question. It was their view that under that plan, the plaintiff children should not suffer, but rather they and all other children

should reasonably be expected to benefit.[8] The parents of the plaintiff children express a fear that, because of the distance separating the home from the school, they will lose contact with the educational experience of their children. On the other hand, the school board had information before it that in a city as large as Seattle, few people live an isolated life within the confines of their neighborhoods. On the contrary, participation in the many activities that are characteristic of city life requires a great deal of movement around town, by automobile, bus or other transportation. Attending a school function or a PTA meeting at any one of the schools to which the plaintiffs' children may be assigned should involve no more inconvenience than a shopping trip to town, or a trip to a public performance at the Seattle Center. Many parents regularly drive or send their children to take special lessons at places as distant from their homes as the schools to which the plaintiff children may be sent, and we doubt seriously that any parent of a handicapped child would find any inconvenience in taking

---

[8]Among the school districts which have successfully inaugurated student reassignment plans (so-called "bussing" plans) is that of Berkeley, California. The superintendent of that district, Dr. Richard L. Foster, testified in the defendants' behalf in the trial of this action that his district had experienced some difficulties in the transition stage but that the plan had then been accepted by the parents and students alike and was achieving the expected improvement in the quality of education for all students.

There is now available evidence of successful achievement of desegregation objectives in other school systems. *See for example* 5 Planning Educational Change, *How Five School Systems Desegregated* (1969), a report of the United States Department of Health, Education & Welfare, Office of Education; C. Planz, *It Can Work: Busing Inner City Pupils to Suburban Schools,* 46 The Clearing House 158 (1971), dealing with the program in Rochester, New York; N. Gross, *Reaching for the Dream: An Experiment in Two-Way Busing,* 17 Children 133, Vol. 4 (1970), a report on a 2-way bussing project in the same city (the author states, "Parent involvement was a crucial factor in the success of the program.") (*See also* a letter at the end of that article signed by Robert Coles, M.D., University Health Services, Harvard University, Cambridge, Mass.); H. Ravis, *The School District of Kankakee, Ill.,* School Management (Aug. 1971) at 18; The Wall Street Journal, April 27, 1970, § 1 at 1, col. 1, an article about the Providence, Rhode Island experience.

or sending that child many miles to a school specially designed for its needs.[9]

Thus, we strongly suspect that it is not the remoteness of the school to which a child may be sent which disturbs the plaintiff parents, but rather it is a fear that the child will find itself in a hostile environment in that school, or that the teachers or the program will be inferior to that which he would expect to find in the school which they have "chosen" for him by moving into a particular neighborhood. Of course, if only a few white children were being transferred to a predominantly black school, there could conceivably be some reason to entertain these fears. There was evidence introduced in this action showing that there had been disciplinary problems involving racial hostilities in at least one of the schools having a predominantly black student body.[10]

This problem of hostilities based upon mutual lack of knowledge and understanding is one of those which the school board seeks to alleviate. Under the plan adopted, there would be no school with a majority of black students. The defendants have necessarily taken into account that racial hostilities do exist and that there will undoubtedly be problems born of these hostilities attendant upon any

---

[9]The United States Supreme Court said in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 29, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971):

Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. Eighteen million of the Nation's public school children, approximately 39%, were transported to their schools by bus in 1969-1970 in all parts of the country.

In light of this fact, it can hardly be said that the "neighborhood school concept" is the only accepted method of student assignment.

[10]In this connection it is interesting to note the testimony of a psychiatrist called by the plaintiffs to testify about the possible mental illness resulting from changes in environment of unstable children. This psychiatrist stated that he felt that a certain amount of vandalism and fighting are normal for growing children. He made the statement with reference to reported incidents at Laurelhurst (a predominantly white school).

program of desegregation. But we cannot say that the board abused its discretion in concluding that unless such a program is undertaken, there is no hope that fear and hostility can be replaced by understanding and acceptance, both of which are required if the children of this state are to be prepared in school to act as enlightened and humane citizens when they reach adulthood.

We are not called upon to review the wisdom of the board's decision. Nevertheless the record shows that there is a reasonable basis for the defendants to have concluded that if the program which they have devised is put into effect and given a chance to operate, most, if not all, of the anxieties of the plaintiffs will prove to have been unfounded. If, on the other hand, the action decided upon should prove to be ill-advised, if the expected benefits do not accrue within a reasonable time and the plaintiffs' fears prove justified, there is no reason to assume that the defendants or their successors will not seek other solutions for the problem which is constantly before them—that of administering the schools in such a way as to provide a sound education for all children.

It is suggested that if the board had taken more time to consider its decision, it would not have adopted the policy because it would have learned that changing the environment of some children, who have an undetected tendency toward mental illness, may result in onset of such illness. The plaintiffs point to testimony of their psychiatric witness that 10 per cent of children are subject to such damage if they are not kept in a stable environment. This doctor (not a child psychiatrist) acknowledged that parental attitudes are a contributing factor. Not surprisingly, none of the plaintiffs claim that their children are victims of this instability.

There is no claim that the doctor's testimony is substantiated by any statistical evidence which the board might consider. At least 39 per cent of America's school children are bussed to school. *Swann v. Charlotte-Mecklenburg Bd. of Educ., supra.* We can take judicial notice that in some

remote areas of this state children are bussed as much as 25 miles daily. Furthermore, traditional progress through school involves change of environment when proceeding from grade school to junior high and from junior high to high school. The school board was entitled to conclude that the risk of adverse effects upon children who have difficulty adapting to new environments was not so great as to warrant sacrificing the benefits which would be experienced by the majority of students.

In meeting contentions that compulsory smallpox vaccinations would be damaging to some, the United States Supreme Court said many years ago, in the leading case of *Jacobson v. Massachusetts,* 197 U.S. 11, 28, 49 L. Ed. 643, 25 S. Ct. 358 (1904):

> If the mode adopted by the Commonwealth of Massachusetts for the protection of its local communities against smallpox proved to be distressing, inconvenient or objectionable to some—if nothing more could be reasonably affirmed of the statute in question—the answer is that it was the duty of the constituted authorities primarily to keep in view the welfare, comfort and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few.

As it was the duty of the defendants in that case, so here it was the duty of the school board to act in the best interests of the majority of students; and the fact that some students might suffer adverse effects was not a consideration which, in law, they were required to find controlling. We are shown no reason to assume that the board, upon further consideration, would have rejected the plan on this ground.

Furthermore, we cannot conceive that if such a problem should arise in the administration of the program, the school officials would not be willing to make adjustments to relieve the distress of individual children. In fact, the defendants' evidence showed that there is an appeal procedure for children whose parents believe they should not participate in the program.

We have no reason to assume that the board will arbi-

trarily refuse relief in a proper case. If it should do so, the law provides a remedy. *State ex rel. McFadden v. Shorrock,* 55 Wash. 208, 104 P. 214 (1909).

Finally, the plaintiff parents advance a theory that the assignment of students to schools outside their immediate neighborhoods is an improper interference with the parental liberty to direct the education of their children. This theory assumes that parents have a right to select the public school which their children shall attend. No authority is cited which supports this proposition. The case of *Pierce v. Society of Sisters,* 268 U.S. 510, 534, 69 L. Ed. 1070, 45 S. Ct. 571, 39 A.L.R. 468 (1924), is cited. In that case the Supreme Court of the United States held that an Oregon statute requiring all persons having control or custody of school-age children to send them to public school, constituted an unreasonable interference with the liberty of such persons to direct the upbringing and education of children under their control. The act in question, the court said, had no reasonable relation to a purpose within the competency of the state. But the court also declared:

> No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

The statutes of this state are in harmony with that decision. Under RCW 28A.27.010, all parents are required to send their children to school. They need not send them to public school, but may send them to private school at their own expense. This court has held that the private school to which a parent elects to send his child must be one which meets certain legislative standards. *State ex rel. Shoreline School Dist. 412 v. Superior Court,* 55 Wn.2d 177, 346 P.2d 999 (1959).

Thus, the right of a parent to direct the education of his child is a limited right. If he sends the child to a

private school, it must be a school which meets the educational standards of the state. And if a parent elects to send his child to public school, he must abide by the reasonable rules and regulations of public school authorities. *Wayland v. Hughes,* 43 Wash. 441, 86 P. 642 (1906).

■ The method chosen by the school board in this instance to implement a sound policy of the school system is exactly that—a reasonable regulation of school authorities, with which those persons affected by it are required to comply unless they can show to the board's satisfaction some reason why they should be excused. The plaintiffs have shown no fundamental right with which the plan interferes, nor have they shown that it is unauthorized by law.

In *State ex rel. Lukens v. Spokane School Dist. 81,* 147 Wash. 467, 474, 266 P. 189 (1928), where, as here, the plaintiffs were patrons of a school and sought judicial review of a policy decision of the school district officers, we said:

> In a nut shell, this whole controversy arises over a question of judgment. The petitioners before the board, the appellants here, are not in agreement with the members of the board. That disagreement of itself is not for the courts. The law has plainly vested the board of directors of school districts such as this with discretionary powers in such matters, and the directors having examined into and passed upon the matter in the exercise of their discretion, the courts have no right or power to review the conclusions reached by them as a board in the absence of a showing of abuse of discretion on their part, which is not the case here.

We have previously held, in *State ex rel. Citizens Against Mandatory Bussing v. Brooks,* 80 Wn.2d 121, 492 P.2d 536 (1972), that the adoption of the method of desegregation under attack here was a proper exercise of the board's discretionary powers. We reaffirm that decision.

In seeking to achieve, at the local level, those purposes which the people of this state have embodied in their constitution and statutes affecting education, school district

directors must necessarily make value judgments. Here they were faced with the problem of weighing those benefits which can be derived from adhering to the neighborhood school concept against those which can be expected to result from an integrated school system. It was the judgment of the board that where residential patterns have created a segregated city, integration of schools cannot be achieved without some modification of the neighborhood school formula. Faced with this delemma, the defendant school directors concluded that their duty of providing for all children an equal opportunity for a sound education could most effectively be performed by adopting such a modification of the existing system. To aid them in making this decision, they had before them evidence of the experience of other school systems which have tried the reassignment method and found it successful. Their decision reflects an exercise of honest and conscientious judgment. We know of no principle of law upon which a court would be justified in setting it aside.

We hold that having chosen the course of action they did, based upon study and conflicting evidence, we cannot say the board's action was arbitrary and capricious. Under the issues of this case we are not called upon to resolve the wisdom of mandatory bussing and therefore we express no opinion thereon at this time.

The injunction is dissolved and the action is dismissed.

HAMILTON, C.J., FINLEY, ROSELLINI, NEILL, STAFFORD, WRIGHT, and UTTER, JJ., and RYAN, J. Pro Tem., concur.

Petition for rehearing denied May 25, 1972.