[No. 72712-1. En Banc.]
Argued October 24, 2002. Decided June 26, 2003.

CERTIFICATION FROM THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
IN

PARENTS INVOLVED IN COMMUNITY SCHOOLS, *Appellant*, v.
SEATTLE SCHOOL DISTRICT NO. 1, ET AL., *Appellees*.

*Daniel B. Ritter* and *Harry J.F. Korrell* (of *Davis Wright Tremaine*), for appellant.

*Michael F. Madden* and *Carol Sue Janes* (of *Bennett Bigelow & Leedom, P.S.*) and *Mark S. Green* (of *Seattle Public Schools, General Counsel's Office*), for appellees.

*Paul J. Lawrence* on behalf of American Civil Liberties Union, amicus curiae.

*Russell C. Brooks* and *Sharon Browne* on behalf of Pacific Legal Foundation, Center for Equal Opportunity, and American Civil Rights Institute, amici curiae.

*Jeffery P. Robinson* and *Sandra E. Widlan* on behalf of Urban League of Metropolitan Seattle, amicus curiae.

CHAMBERS, J. — We are asked by the Ninth Circuit Court of Appeals to interpret RCW 49.60.400 to determine whether it prohibits all race-cognizant state government action or whether the act allows some race-cognizant state action, while limiting others. We are also invited to determine whether the Washington Constitution's unique treatment of education requires racial integration in schools, or merely permits integration absent legislation to the contrary. After examining Washington history, our constitution, and RCW 49.60.400, we conclude that the act prohibits some, but not all, race-cognizant government action. Affirmative action programs which advance a less qualified

applicant over a more qualified applicant are now impermissible under Washington law. Programs which are racially neutral, such as the Seattle School District No. 1's open choice plan, are lawful.

Seattle School District No. 1 (School District) has 10 high schools. Because of racially segregating housing patterns, mandatory assignment to neighborhood schools would result in largely segregated schools. Because the School District believes that a racially diverse educational experience provides a superior education for all students, it has adopted a plan that allows students a measure of choice while attempting to ensure that schools do not become segregated. Because some schools are oversubscribed and not all students have their first choice of schools, the School District applies a series of tie breakers, one of which is specifically designed to promote racial diversity. This tie breaker operates only on schools that are more than 75 percent minority or less than 25 percent Caucasian, and operates only until the school is in closer balance.

We find that the School District's open choice plan does not conflict with RCW 49.60.400. Accordingly, we return this case to the federal court for further proceedings consistent with this opinion.

### PROCEDURAL HISTORY

Seattle public high schools allow any student in the school district to attend any school. If there is room in the school, the student is admitted. Some schools are more popular than others. If more students seek admission than there is space, the School District uses a series of "tie breakers" to allocate students to the schools. The second tie breaker is race, and is used to keep the oversubscribed schools from becoming segregated.

Appellant, Parents Involved in Community Schools (PICS), is a Washington nonprofit corporation formed by Seattle parents whose children have been or may be denied admission to their preferred high school because the school

was oversubscribed and admitting them would increase racial imbalance. PICS challenges the "open choice" plan in federal court on both state and federal grounds.

The School District and its directors in their official capacity are the appellees. During the proceedings before the United States District Court for the Western District of Washington, PICS and the School District both moved for summary judgment. The federal district court granted the School District's motion holding that the open choice plan did not violate state or federal law. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 137 F. Supp. 2d 1224, 1240 (W.D. Wash. 2001) (*PICS I*), *overturned by* 285 F.3d 1236 (9th Cir. 2002) (*PICS II*), *opinion withdrawn by* 294 F.3d 1085 (9th Cir. 2002). Judge Rothstein reasoned that while RCW 49.60.400 was susceptible to the interpretation proposed by the parents' group, that construction rendered it unconstitutional under article IX of the Washington Constitution because it forbade positive efforts to provide a general and uniform education to all students.[1] She found the act was also susceptible to a more limited interpretation that did not run afoul of the state constitution, and gave it that interpretation to avoid holding a Washington statute unconstitutional. Under that more limited interpretation, she upheld the open choice plan. *See PICS* I, 137 F. Supp. 2d at 1227-28.

The United States Court of Appeals for the Ninth Circuit initially reversed. *PICS* II, 285 F.3d 1236. Both parties sought reconsideration. Realizing that the matter could not be finalized before the 2002-03 school assignments were made, the Ninth Circuit, on its own motion, withdrew its opinion, stayed further proceedings, and certified the state law questions to this court by an order dated June 17, 2002. *See* Order at 2. We accepted certification.

---

[1] Specifically, Judge Rothstein found that "[t]he Washington Constitution . . . imposes a duty on school boards to operate racially integrated schools, and recognizes the reality that in some cases, to fulfill that duty, a school board may need to take race into account." *PICS* I, 137 F. Supp. 2d at 1228.

CERTIFIED QUESTIONS

The Ninth Circuit Court of Appeals has certified this question to us:

By using a racial tiebreaker to determine high school assignments, does Seattle School District Number 1 "discriminate against, or grant preferential treatment to, any individual or group on the basis of race, . . . color, ethnicity, or national origin in the operation of . . . public education" in violation of Initiative 200 (I-200), codified at Washington Revised Code § 49-.60.400?

Order at 5-6. The Ninth Circuit suggested that we also consider several other questions before reaching a decision:

Should the term "preference" in I-200 be interpreted to have its ordinary lay meaning, in accordance with Washington cases holding that the average voter is the touchstone for the construction of an initiative, or are state law and/or federal law to be relevant in interpreting I-200? If state law is relevant, are California cases construing Proposition 209, the wording of which is identical to I-200, relevant?

Is the meaning of I-200 clear, or is the text ambiguous, making consideration of voter's pamphlet material relevant? If it is pertinent to the analysis, what factors should be used to evaluate this material?

Does article 9, section 1, of the Washington Constitution, or article 9, section 2, of the Washington Constitution, *require* that measures be taken to mitigate *de facto* segregation, or only *permit* it? In any event, is the Seattle School District's use of the racial tiebreaker required, permitted, or otherwise under the Washington Constitution and I-200?

Order at 15-16.

FACTS

*A. SEATTLE DEMOGRAPHICS*

Seattle is a diverse community. Approximately 70 percent of residents are Caucasian, and 30 percent people of color.

*See* Order at 6. Seattle public school students break down nearly inversely, with approximately 40 percent Caucasian and 60 percent people of color. *Id.*

While as a whole Seattle is a diverse community, racial distribution is not homogenous. About 66 percent of all Caucasian students live on the waterfront or north of downtown and 84 percent of all African American students live south of the Seattle downtown area. Were geography alone used to determine school assignment, the different schools in the district would be racially segregated. Order at 6;[2] *see also PICS* I, 137 F. Supp. 2d at 1237.

### B. SEATTLE OPEN CHOICE PLAN

Seattle operates 10 public high schools: Ballard, Chief Sealth, Cleveland, Franklin, Garfield, Ingraham, Nathan Hale, Rainier Beach, Roosevelt, and West Seattle. "Four of these high schools (Ballard, Ingraham, Nathan Hale, and Roosevelt) are located north of downtown Seattle; of the remaining six, five (Chief Sealth, Cleveland, Franklin, Garfield, and Rainier Beach) are located south of downtown, and one (West Seattle) is located directly west of down town." Order at 7. These high schools vary widely in desirability. Three of the northern schools (Ballard, Nathan Hale, and Roosevelt) and two of the southern schools (Garfield and Franklin) are highly desirable and oversubscribed. The remaining schools are less desirable, and far fewer students seek to attend them.

The Seattle schools have never been segregated as a matter of law. However, merely local assignments would result in segregated schools. To avoid this de facto segrega-

---

[2] The Ninth Circuit found that "due to Seattle's racial diversity and its racially imbalanced housing patterns, if Seattle's children were simply assigned to the high schools nearest their homes, the high schools would become segregated in fact (*'de facto'* segregated)." Order at 8. Counsel for PICS disputed this at oral argument. Given that this order is consistent with the decision of the federal trial court, and given that the matter is on appeal from a federal trial court to a federal appellate court and our appropriate role is limited to deciding questions of Washington law, we decline to reconsider this fact. We, of course, do not intend to bar the parties from relitigating this matter in the appropriate forum.

tion in high schools, the School District adopted an open choice assignment plan. Instead of assigning students to their local schools, the School District allows students to attend any school in the district. If the school is undersubscribed, the student is admitted. However, the quality and reputation of the various schools weighs so heavily on student choice that 82 percent rank the same five schools as their first choice, leaving only 18 percent ranking the other five schools as their first choice. The School District established four "tiebreakers" to allocate students between the oversubscribed schools.[3]

*First, the sibling tie breaker.* Students with a sibling already attending the school will be assigned to their preferred school first. This accounts for 15-20 percent of assignments.

*Second, the racial tie breaker.* The school has found diversity to be a compelling factor in school assignments, and attempts to approximate in each oversubscribed school the racial mix of the public school population overall. If a school is oversubscribed, and if the school deviates more than 15 percent from the overall demographic makeup of Seattle students, either minority or Caucasian students will be assigned to the school until it mirrors the overall student population demographic within 15 percent. Put another way, the tie breaker is triggered when the high school's student population is either less than 25 percent Caucasian or more than 75 percent minority. Once racial balance is achieved, the school stops using the racial tie breaker. This accounts for about 10 percent of high school assignments.

*Third, the distance tie breaker.* Any remaining seats are allocated according to distance from the preferred school, with those nearest receiving preference. This accounts for about 70-75 percent of assignments.

---

[3] It appears that the only students subject to "assignment" are those students seeking to attend an oversubscribed school. *See* Order at 9-10. Given the record before us, we cannot ascertain how many students are or will be affected by this, but the School District contends it is very few.

*Fourth, lottery.* The remaining assignments are done on the basis of a lottery. But as a practical matter, the lottery rarely occurs.

<h2 style="text-align:center">Contentions of the Parties</h2>

We first briefly review the arguments before us. The School District established to the federal trial court's satisfaction that without some positive effort to achieve racial balance, Seattle schools would be largely segregated based upon housing patterns within the district. The School District contends that all students who attend racially diverse schools receive a superior and richer educational experience that better prepares them to participate and succeed in a diverse society than students who attend segregated schools. The racial tie breaker is designed to achieve the educational goal of providing an education within a racially diverse environment and avoiding the segregated education of the past.

The core of the School District's statutory argument is that the open choice plan is not discrimination or preference as meant by law or understood by the average informed voter. The School District contends that properly understood, the tie breaker is racially neutral. It argues that the tie breaker differs from the "reverse discrimination" racial preference programs prohibited by RCW 49.60.400, where members of one race are given a preference over members of another race.

The School District attempts to demonstrate that its open choice plan restricts both Caucasian and minority students equally. It points out that any student might be prevented from enrolling in the school of his or her choice. Under the open choice plan, an African American student may be prevented from enrolling in a school which is already 76 percent minority, and a Caucasian student may be prevented from enrolling in a school which is already 26 percent Caucasian. For example, "[e]ighty-nine more white students were assigned to Franklin than would have been

absent the tiebreaker . . . and 27 more nonwhite students to Hale." *PICS* I, 137 F. Supp. 2d at 1226 n.4. The School District also argues that the racial balancing program is not discriminatory or preferential because it does not advance a less qualified student above a more qualified student on the basis of race. It points to a long line of both federal and state court opinions interpreting the fourteenth amendment to the United States Constitution that have found such race neutral balancing plans to be nondiscriminatory and nonpreferential. An average informed voter, argues the School District, would not have understood Initiative 200 (I-200) to prohibit such racially neutral plans.

PICS, on the other hand, contends that RCW 49.60.400 prohibits more than just the "reverse discrimination" style of affirmative action, and that any racially cognizant government decision or action is now unlawful. Illustratively, counsel for PICS conceded at oral argument that under its interpretation our governor would be forbidden to appoint a paid commission to study the effects of potentially discriminatory laws and policies, if the governor wanted the composition of the commission to mirror the racial and ethnic mix of our population.

PICS also argues that Seattle has never suffered de jure segregation and is not justified in using a racial balancing program to remedy merely de facto segregation. We note that although PICS praises the advantages of attending a local school, it does not claim a right to attend the school nearest to home.[4] Courts have considered and rejected any legally protected right to have children attend their nearest school. *See Citizens Against Mandatory Bussing v. Palmason*, 80 Wn.2d 445, 453, 495 P.2d 657 (1972); *accord Bustop, Inc. v. Bd. of Educ.*, 439 U.S. 1380, 1382-83, 99 S.

---

[4] We note that some students face dauntingly difficult commutes to their assigned schools. At oral argument, counsel for the School District informed us that every student has a choice of attending either a highly regarded school or a local school (which may be the same school). It appears that the students with the most difficult commutes refused to make any election, and were assigned to an undersubscribed school without consideration of their location. On the record and order before us, it is impossible to determine what their commute would have been had they participated in the selection process.

Ct. 40, 58 L. Ed. 2d 88 (1978).[5] Students may be reassigned to other schools on any of a variety of grounds including, but not restricted to, overcrowding, unsafe conditions, the need to balance class sizes, and the accommodation of bus routes.

Reduced to its essence, the School District argues that a race-cognizant (but racially neutral) program which serves legitimate education goals and does not advance a less qualified student over a more qualified student is not discriminatory or preferential as understood by law or the average informed voter. Reduced to its essence, PICS argues that RCW 49.60.400 prohibits all race-cognizant state action. Both argue that article IX of the state constitution supports their contentions.

ANALYSIS

*A. STANDARDS OF REVIEW*

█ *Review of Certified Questions.* This court may accept certified questions of unsettled state law from other courts. The certified question presents only questions of law. Review is de novo. *Rivett v. City of Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994).

█ *Review of Initiatives.* Initiatives will be interpreted from their plain language, if possible. However, when an initiative is susceptible to multiple interpretations, we employ the standard tools of statutory construction to aid our interpretation. *W. Petroleum Imps., Inc. v. Friedt*, 127 Wn.2d 420, 423, 899 P.2d 792 (1995); *Seeber v. Pub. Disclosure Comm'n*, 96 Wn.2d 135, 139, 634 P.2d 303 (1981) (citing *State ex rel. Pub. Disclosure Comm'n v. Rains*, 87

---

[5] Students do not have a statutory right to be provided with transportation to schools. *See* RCW 28A.160.010 ("[E]ach board of directors shall determine . . . which individual students shall be transported"). If a school district indeed required a student to spend hours each day on a bus thereby effectively denying the student the opportunity to participate in school extracurricular activities and drastically reducing study time, it may implicate the State's paramount duty to provide a basic and uniform education. The parties do not argue whether article IX imposes a duty to provide educational opportunities within reasonably accessible travel time and distance to students, and we do not address the issue.

Wn.2d 626, 633 n.5, 555 P.2d 1368 (1976)). The words of an initiative will be read "as the average informed lay voter would read [them]." *Friedt*, 127 Wn.2d at 424 (citing *Estate of Turner v. Dep't of Revenue*, 106 Wn.2d 649, 654, 724 P.2d 1013 (1986)). If necessary, we will consider the official *Voters Pamphlet. State v. Thorne*, 129 Wn.2d 736, 763, 921 P.2d 514 (1996) (citing *Hi-Starr, Inc. v. Liquor Control Bd.*, 106 Wn.2d 455, 460, 722 P.2d 808 (1986)).

Initiatives are presumed constitutional. *Gerberding v. Munro*, 134 Wn.2d 188, 196, 949 P.2d 1366 (1998). If an initiative, like a statute, "is susceptible of several interpretations, some of which may render it unconstitutional, the court, without doing violence to the legislative purpose, will adopt a construction which will sustain its constitutionality if at all possible to do so." *State ex rel. Morgan v. Kinnear*, 80 Wn.2d 400, 402, 494 P.2d 1362 (1972) (citing *State v. Dixon*, 78 Wn.2d 796, 479 P.2d 931 (1971)). Initiatives may not be used to circumvent the constitutionally prescribed methods of amending the state constitution. *Gerberding*, 134 Wn.2d at 210 n.11. When legislating by initiative, the people "remain subject to the mandates of the Constitution." *Id.* at 196 (citing *Culliton v. Chase*, 174 Wash. 363, 373-74, 25 P.2d 81 (1933)).

## B. HISTORY

RCW 49.60.400 is best understood in the context of the history of civil rights, race relations, education, and school segregation. The State of Washington has a rich and unique history. Washington became a state and adopted its constitution more than 100 years after the federal constitution, and decades after the civil war and civil war amendments to the federal constitution. The stirring issues before our state constitutional framers differed from those before the framers of the national government. Our state constitution begins with a lengthy Bill of Rights; our federal constitution has one tacked on at the end. Our state constitution is a complete charter establishing the day-to-day operation of a

government of general powers rather than the specific grant of limited powers embodied by the federal constitution. Unsurprisingly, our state constitution is significantly different from the federal constitution. Strikingly, the treatment of education in the Washington Constitution is singular among states. *See Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 497-98, 585 P.2d 71 (1978) (surveying state constitutions). Our constitution sets education as the State's highest priority, declaring it to be the "paramount duty" of state government. CONST. art. IX, § 1.

The Washington constitutional convention delegates were practically unanimous in drawing up an education article which protected the common school fund and set up a democratic, nonsectarian system of public education. The *Tacoma Daily Ledger* ran a series of four editorials featuring an educational system for the new state. *See* Quentin Shipley Smith, *Analytical Index* to THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 685 (Beverly Paulik Rosenow ed., 1999). The *Tacoma Daily Ledger* wrote that education should be "the paramount duty of the state." TACOMA DAILY LEDGER, July 1, 1889. The British colony Victoria (now known as Australia) was admired for its uniformity in charts, manuals, methods, and highly competent instructors. TACOMA DAILY LEDGER, July 3, 1889. These newspaper editorials and ensuing debates culminated in two sections of the state constitution.

Article IX of our constitution states in relevant part:

It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex.

The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such high schools, normal schools, and technical schools as may hereafter be established. But the entire revenue derived from the common school fund and the state tax for common schools shall be exclusively applied to the support of the common schools.

CONST. art. IX, §§ 1-2.

In 1890, the first state legislature expressed the breadth of the State's paramount duty to educate:

> It shall be the duty of all teachers to endeavor to impress on the minds of their pupils the principles of morality, truth, justice, temperance and patriotism; to teach them to avoid idleness, profanity and falsehood; to instruct them in the principle of free government, and to train them up to the true comprehension of the rights, duty and dignity of American citizenship.

LAWS OF 1890, ch. XII, § 42, at 371.

This court has unambiguously held that article IX, section 1 imposes upon this State the mandatory and paramount duty to provide a general and uniform education without distinction or preference on account of race to all children in this state. *Seattle Sch. Dist. No. 1*, 90 Wn.2d at 517. Our constitution is unique in placing paramount value on education for citizenship. *See id.* at 497-99, 516-17.[6]

Further, after careful consideration of the language and purpose of article IX, section 1, we held that the "paramount" duty to provide a general and uniform education was not merely a duty that was "important" but rather a duty that was "superior in rank, above all others, chief, preeminent, supreme, and in fact dominant." *Seattle Sch. Dist. No. 1*, 90 Wn.2d at 511. This duty is borne by the State and is not discharged by delegating the responsibility to local districts. Accordingly, we recognized that the constitution required that the State "provide for the fully sufficient and ample funding of the program by appropriation *or* through regular and dependable tax sources." *Id.* at 487.

General and uniform education, within the meaning of our constitution, is far broader than merely reading, writing, and arithmetic:

> [T]he State's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our

---

[6] We recognize that the State of Florida recently amended its constitution to provide that education is "a paramount duty." FLA. CONST. art. IX, § 1.

children for their role as citizens and as potential competitors in today's market as well as in the marketplace of ideas. Education plays a critical role in a free society. It must prepare our children to participate intelligently and effectively in our open political system to ensure that system's survival. It must prepare them to exercise their First Amendment freedoms both as sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain maturity and understanding.

*Seattle Sch. Dist. No. 1*, 90 Wn.2d at 517-18 (citations omitted).

This is not the first time we have considered the pressing issues of public education and segregation. Previously, the question posed to this court was whether the federal constitution's equal protection clause permitted school districts to voluntarily desegregate. However, it is within the historical context unique to our state that our constitutional jurisprudence must be understood.

We first entered school desegregation waters in 1972. *See State ex rel. Citizens Against Mandatory Bussing v. Brooks*, 80 Wn.2d 121, 492 P.2d 536 (1972). Again, the case involved the Seattle School District's attempt to desegregate. A group of citizens brought a recall effort against the school board. We held that an attempt to desegregate public education was not a recallable offense. *Id.* at 128. We noted with approval that voluntary desegregation of public education was an appropriate exercise of discretion. " 'School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion of the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities.' " *Brooks*, 80 Wn.2d at 128 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971)).

We also held that allowing the recall effort to go forward on those grounds would offend the principles underlying

the Fourteenth Amendment. *Brooks*, 80 Wn.2d at 128-29. We also found the fact the segregation was de facto insignificant. "Reason impels the conclusion that, if the constitution supports court directed mandatory bussing to desegregate schools in a system which is dual 'de jure,' then such bussing is within the appropriate exercise of the discretion of school authorities in a system which is dual 'de facto.' " *Id.* at 128.

Shortly afterward, we considered the plan itself. *Palmason*, 80 Wn.2d 445. The same citizen's group had persuaded a judge to enjoin implementation of the desegregation plan. We dissolved the injunction. While that case dealt mostly with the appropriate scope of judicial review of a school board decision, we noted that the school district did not abuse its discretion by pursuing desegregation:

> in concluding that unless such a program is undertaken, there is no hope that fear and hostility can be replaced by understanding and acceptance, both of which are required if the children of this state are to be prepared in school to act as enlightened and humane citizens when they reach adulthood.

*Id.* at 456. We relied in part on the danger that allowing a referendum on administrative decisions "would enable the voters of any community to frustrate the purpose of Const. art[.] 9, § 1." *Id.* at 449. Finally, we concluded that there was no right under Washington law to attend a local school or the school of the student's choice. *Id.* at 453.

We returned to the subject the next year in the context of law school admissions. *DeFunis v. Odegaard*, 82 Wn.2d 11, 507 P.2d 1169 (1973), *judgment vacated by* 416 U.S. 312, 94 S. Ct. 1704, 40 L. Ed. 2d 164, *and reinstated by* 84 Wn.2d 617, 529 P.2d 438 (1974). DeFunis, a Caucasian male law school candidate, was not admitted to the University of Washington law school; several minority candidates with lower test scores were. He sued, claiming that the Fourteenth Amendment was offended by any consideration of race in law school admissions, even for the salutary purpose of desegregating the practice of law. *DeFunis*, 82 Wn.2d at 25. We rejected his claim. We declared in *DeFunis* that "the

constitution is color conscious to prevent the perpetuation of discrimination and to undo the effects of past segregation." *Id.* at 29. We found that this State had an overwhelming and compelling need to have minority judges and attorneys. *Id.* at 32-33.

This court has repeatedly and clearly found that segregation offends the values of our national constitution, be that segregation de facto or de jure, and that school districts are empowered to work to end that discrimination.

## C. DESEGREGATION AND REVERSE DISCRIMINATION

Attempts to desegregate our nation's schools, businesses, and institutions have sometimes led to claims of reverse discrimination. Historically, courts have distinguished between reverse discrimination and racially neutral programs. For our purposes, reverse discrimination refers to programs that grant a preference to less qualified persons over more qualified persons based upon race. *Cf. Johnson v. Cent. Valley Sch. Dist. No. 356*, 97 Wn.2d 419, 645 P.2d 1088 (1982). Reverse discrimination has sometimes been referred to as the "stacked deck" approach to achieve racial balance. *See, e.g., Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 707 n.16 (9th Cir. 1997). Racially neutral programs treat all races equally and do not provide an advantage to the less qualified, but do take positive steps to achieve greater representation of underrepresented groups. Racially neutral programs have been referred to as "reshuffle" programs. *Id.* at 707 n.16.

A Ninth Circuit's observation is illustrative of our understanding of the difference between stacked deck affirmative action programs and neutral racial balancing programs:

We have recognized, however, that " 'stacked deck' programs [such as race-based 'affirmative action'] trench on Fourteenth Amendment values in ways that 'reshuffle' programs [such as school desegregation] do not." *Unlike racial preference programs*, school desegregation programs are not inherently invidious, do not work wholly to the benefit of certain members of

one group and correspondingly to the harm of certain members of another group, and do not deprive citizens of rights.

*Wilson,* 122 F.3d at 707 n.16 (emphasis added) (quoting *Associated Gen. Contractors of Cal. v. S.F. Unified Sch. Dist.,* 616 F.2d 1381, 1387 (9th Cir. 1980)). This difference between "preference programs" and other types of affirmative action measures has been recognized in other contexts. Said one scholar:

> Perhaps the best way to understand the distinction between affirmative action and preferences is that in order for a person to receive a preference, another person—whether identifiable or not—must suffer discrimination. For example, the use of busing to achieve school integration is not a preference. The goal of busing is to provide children with an education in an integrated setting, a benefit that accrues to all races. Further, busing does not deny any child the opportunity to go to school, and the burden of being sent to a different school is generally borne by children of all races.

Note, *The Constitutionality of Proposition 209 as Applied,* 111 Harv. L. Rev. 2081, 2084-85 (1998) (footnotes omitted); *accord* Neil S. Hyytinen, Comment, *Proposition 209 and School Desegregation Programs in California,* 38 San Diego L. Rev. 661 (2001).[7]

The writings of Justice Hale help to crystallize the distinction between preferential affirmative action or reverse discrimination and race neutral balancing. Writing for the majority in *Palmason,* Justice Hale upheld a racially neutral busing integration program which treated minorities and Caucasians alike saying:

> But we cannot say that the board abused its discretion in concluding that unless such a program is undertaken, there is no hope that fear and hostility can be replaced by understanding and acceptance, both of which are required if the children of

---

[7] Subsequent decisions of the California courts have found Proposition 209 does bar any consideration of race in many contexts. *See, e.g., Hi-Voltage Wire Works, Inc. v. City of San Jose,* 24 Cal. 4th 537, 12 P.3d 1068, 101 Cal. Rptr. 2d 653 (2000). Washington voters, of course, could not have been aware of these postelection cases.

this state are to be prepared in school to act as enlightened and humane citizens when they reach adulthood.

*Palmason*, 80 Wn.2d at 456. One year later in *DeFunis*, this court upheld, on Fourteenth Amendment grounds, a clearly "preferential" program where minorities with lower undergraduate grades and law school admission test scores were admitted to the University of Washington School of Law as part of an affirmative action program to achieve greater diversity among lawyers. There, Justice Hale dissented declaring: "Racial bigotry, prejudice and intolerance will never be ended by exalting the political rights of one group or class over those of another. The circle of inequality cannot be broken by shifting the inequities from one man to his neighbor." *DeFunis*, 82 Wn.2d at 45 (Hale, C.J., dissenting).

Finally, of current significance is the movement during the late 1990s aimed at curtailing affirmative action, which culminated in Washington with the vote on I-200. Many of its proponents saw no significant difference between oppressive laws, traditions, and policies used to separate—and subjugate—based on race, such as Jim Crow laws, and race conscious policies to end racial oppression and segregation. *Cf.* John Carlson, *I-200: The Argument in Favor*, SEATTLE TIMES, Feb. 1, 1998, at B5. Whether reverse discrimination was justified or necessary to reverse the effects of racial discriminatory practice of the past was hotly debated. The preference programs, it was argued, suggested to minorities that they could not compete without special help, rather than functioning as a method of overcoming historical oppression. *See, e.g.,* David Postman, *I-200 Debate Focuses On Fix For 'White Privilege'*, SEATTLE TIMES, Oct. 10, 1998, at A11. Amid this heated national debate, California voters, in 1996, passed Proposition 209, and two years later Washington voters followed suit by adopting I-200, now codified as RCW 49.60.400.

Initiative 200 was promoted as a civil rights measure that eliminated racial preferences in public employment, contracting and education. While similar in many ways, it

was not the same measure as California's Proposition 209. Most importantly, the language differed significantly. Also, structurally, Proposition 209 was a proposed amendment to the California Constitution, while I-200 was a proposed statutory change. After the Washington election, the populist antiaffirmative action movement faded.[8] In 1997, Houston, Texas voters rejected a measure that would have dismantled the city's contracting program, which granted preferences to minority and women contractors. R.A. Dyer, *Race Preference Foes Across U.S. Face Uphill Fight / Houston Vote Illustrates Power of Affirmative Action's Support*, HOUS. CHRON., Nov. 9, 1997, at 1. A clone of Proposition 209 failed to reach the ballot in Florida. Sylvia R. Lazos Vargas, *Judicial Review of Initiatives and Referendums in Which Majorities Vote on Minorities' Democratic Citizenship*, 60 OHIO ST. L. J. 399, 419 n.76 (1999). With Washington's unique historical perspective in mind, we turn to the certified questions.[9]

## D. ARTICLE IX

We are invited by the Ninth Circuit and the parties to determine whether article IX, sections 1 and 2 of the

---

[8] The *Seattle Times* recently reported:

When Initiative 200 passed four years ago, it looked as if Washington was on the cutting edge of a nationwide movement to scrap affirmative action.

Today, Washington is an anomaly, one of only two states to prohibit public agencies from considering race and gender in hiring, public-works construction and school admissions. The political movement that spawned I-200 has all but fizzled.

Alex Fryer, *Affirmative-Action Fight Shifts from Ballot Box to Courtroom; Judges Being Asked to Clarify State's I-200*, SEATTLE TIMES, Nov. 25, 2002, at A1.

[9] We note in passing that an important issue is not before the court: whether this plan is narrowly tailored to meet a compelling state interest. However, a considerable amount of PICS's briefing is essentially devoted to it. PICS argues the open choice enrollment plan is not narrowly tailored to meet a compelling state interest because it takes no notice of intraminority diversity, and because every school would be diverse without the tie breaker, the School District makes no effort to put the undersubscribed schools in racial balance. While these arguments are interesting, they are misplaced. They should be addressed in the context of PICS's equal protection clause argument which has been raised to the federal court. The federal court has not requested that this court advise it on the equal protection clause.

Washington State Constitution requires measures to mitigate de facto segregation of schools, or merely permits such efforts. Because it is of such undoubted significance to the statutory questions, we will briefly address this before turning to the statutory question. We have never squarely addressed this issue in the context of our state constitution. Our racial segregation cases have been analytically grounded on the Fourteenth Amendment. However, as Judge Rothstein noted, these cases were decided within the context of education and Washington's unique approach to the State's paramount duty to provide a general and uniform basic education to all children regardless of race, color, caste, or sex. The School District argues that an integrated education is integral to a general and uniform basic education because a segregated education is an inferior education. It contends that students who are provided a racially and ethnically rich educational experience are better equipped to live and succeed in a racially and ethnically diverse world.

■ Historically, courts have often treated racial balancing programs in education different from similar programs involving employment, public contracts and housing. *See, e.g., Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873; *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978). First, the justifications for racial integration are strong and lie close to the central mission of public schools. The goals of teaching tolerance and cooperation among the races, of molding values free of racial prejudice, of preventing minority students from becoming isolated from the rest of the educational system, and eliminating or preventing the emergence of a problematic class of "minority schools" are integral to the mission of public schools. *See, e.g., Swann*, 402 U.S. at 16; *Brown*, 347 U.S. at 493; *Citizens for Better Educ. v. Goose Creek Consol. Indep. Sch. Dist.*, 719 S.W.2d 350, 352-53 (Tex. Ct. App. 1986) ("School authorities are traditionally given broad discretionary powers to formulate and implement educational policy and may properly decide

to ensure to their students the value of an integrated school experience."). As one court noted:

> In a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better. It is during their formative school years that firm foundations may be laid for good citizenship and broad participation in the mainstream of affairs. Recognizing this, leading educators stress the democratic and educational advantages of heterogeneous student populations and point to the disadvantages of homogeneous student populations, particularly when they are composed of a racial minority whose separation generates feelings of inferiority. It may well be, as has been suggested, that when current attacks against housing and economic discriminations bear fruition, strict neighborhood school districting will present no problem. But in the meantime the states may not justly deprive the oncoming generation of the educational advantages which are its due, and indeed, as a nation, we cannot afford standing by.

*Booker v. Bd. of Educ.*, 45 N.J. 161, 170-71, 212 A.2d 1 (1965); *see also Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood*, 257 N.J. Super. 413, 464-65, 470, 608 A.2d 914 (App. Div. 1992), *aff'd mem.*, 132 N.J. 327, 625 A.2d 483 (1993); *see generally Palmason*, 80 Wn.2d 445. We are not so far removed from the time when minorities were systematically excluded from educational benefits to not be wary of any policy or practice that might deprive any child of an ample, general and uniform education. *See generally* PETER IRONS, JIM CROW'S CHILDREN: THE BROKEN PROMISE OF THE *Brown* DECISION (2002) (describing in detail the systematic deprivation of education of freed slaves).

Further, there is strong empirical evidence that a racially diverse school population provides educational benefits for all students. Most students educated in racially diverse schools demonstrated improved critical thinking skills— the ability to both understand and challenge views which are different from their own. *PICS* I, 137 F. Supp. 2d at 1226; *see also* Erica Frankenberg & Chungmei Lee, *Race in*

*American Public Schools: Rapidly Resegregating School Districts* (The Civil Rights Project, Harv. Univ., Aug. 8, 2002); Gary Orfield, *Schools More Separate: Consequences of a Decade of Resegregation* (The Civil Rights Project, Harv. Univ., July 2001); JANET WARD SCHOFIELD & H. ANDREW SAGAR, DESEGREGATION, SCHOOL PRACTICES, AND STUDENT RACE RELATIONS (1983). Research has also shown that a diverse educational experience improves race relations, reduces prejudicial attitudes, and achieves a more democratic and inclusive experience for all citizens, *PICS* I, 137 F. Supp. 2d at 1226; *see also* Frankenberg & Lee, *supra*; IRONS, *supra*; Michal Kurlaender & John T. Yun, *Is Diversity a Compelling Educational Interest? Evidence from Metropolitan Louisville* (The Civil Rights Project, Harv. Univ., Aug. 2000); Orfield, *supra*; WARD SCHOFIELD & SAGAR, *supra*.

 In some circumstances the federal constitution requires positive measures to overcome racial segregation. Admittedly, we have never explicitly held that the state constitution requires racial integration. We have, however, been unwavering in holding that article IX imposes upon the State the paramount duty to provide an ample, general, and uniform basic education to all children. Therefore, if it is determined that in a contemporary setting de facto segregated schools cannot provide children with the educational opportunities necessary to equip them for their role as citizens, then the state constitution would most certainly mandate integrated schools. However, given the procedural posture of this case and the fact that we can answer the certified question without deciding the constitutionality of RCW 49.60.400, we do not reach the question of whether the state constitution merely permits or requires integration in public schools. We accordingly turn to the statutory questions.

### E. THE MEANING OF RCW 49.60.400: PREFERENCE AND DISCRIMINATION

 The court must decide whether the open choice

enrollment plan violates RCW 49.60.400. This turns on the meanings of two words; "preference" and "discrimination." PICS argues that the words plainly and unambiguously bar any consideration of race whatsoever. The School District argues that RCW 49.60.400 should be understood only to bar programs that promote a less qualified applicant over a more qualified applicant. Alternatively, they argue that to the extent RCW 49.60.400 bars any consideration of race to avoid or remedy de facto segregation of public schools, it is unconstitutional. If the statute's meaning is plain and unambiguous, as PICS claims, then no construction is necessary. If it is not, consideration of other authorities, such as case law and ballot materials, is appropriate.

RCW 49.60.400 reads:

(1) *The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of* public employment, *public education*, or public contracting.

(2) This section applies only to action taken after December 3, 1998.

(3) *This section does not affect any law or governmental action that does not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin.*

(4) This section does not affect any otherwise lawful classification that:

(a) Is based on sex and is necessary for sexual privacy or medical or psychological treatment; or

(b) Is necessary for undercover law enforcement or for film, video, audio, or theatrical casting; or

(c) Provides for separate athletic teams for each sex.

(5) This section does not invalidate any court order or consent decree that is in force as of December 3, 1998.

(6) This section does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state.

(7) *For the purposes of this section, "state" includes,* but is not necessarily limited to, the state itself, *any* city, county, public

college or university, community college, *school district*, special district, or other political subdivision or governmental instrumentality of or within the state.

(8) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of Washington antidiscrimination law.

(9) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law, the United States Constitution, or the Washington state Constitution, the section shall be implemented to the maximum extent that federal law, the United States Constitution, and the Washington state Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section.

RCW 49.60.400 (emphasis added).[10]

The key terms that must be understood to analyze the lawfulness of the open choice enrollment plan are "discriminate against" and "grant preference to." *See* RCW 49-.60.400(1), (3). We must decide whether the terms apply to reverse discrimination as we have defined it (where a less qualified applicant is given advantage over a more qualified applicant), or, as is urged by PICS, whether the initiative forbids all cognizance of race by the State, even to serve the core mission of the schools. We find several difficulties with PICS's position.

First, subsection (3) strongly evidences that some race conscious decisions are acceptable:

(3) This section does not affect any law or governmental action that does not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin.

RCW 49.60.400. This clause strongly implies that RCW 49.60.400 does not ban all government action that is cogni-

---

[10] The code reviser added a header to 49.60.400 which reads: "Discrimination, preferential treatment prohibited." Headings are added by the code reviser subsequent to enactment, as part of codification. RCW 44.20.050. They are of little use as a guide to the intent of the legislature. *Cf. State v. Arndt*, 87 Wn.2d 374, 379, 553 P.2d 1328 (1976).

zant of race as it would be surplusage otherwise. PICS argues that subsection (3) is merely a restatement of subsection (1), but stated differently. PICS would have us read the initiative as if words did not exist; in this case all of the words in subsection (3). If at all possible, we are required to "give effect to every word, clause and sentence in a statute," leaving no part superfluous. *Cox v. Helenius*, 103 Wn.2d 383, 387, 693 P.2d 683 (1985). Subsection (3) unequivocally states that some government action within the subject area of the initiative would not be affected, and thus strongly suggests to the average voter that some race conscious action by the government is permissible. Subsection (3) carves out from the prohibition of the statute government action cognizant of race, sex, color, ethnicity, or national origin that does not discriminate against or grant preferential treatment based on the enumerated characteristics.

Second, PICS would have us read RCW 49.60.400 as if it were written: "The state shall not consider race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracts." Put another way, it would have us read the initiative as if the words "shall not discriminate against, or grant preferential treatment to any individual or group on the basis of" did not exist, and instead substitute the word "consider." The words "grant preference" and "discriminate against" have meaning and significance.

The word "preference" also appears in article IX, section 1 of our constitution, which obligates the State to provide ample education "without distinction or preference on account of race, color, caste, or sex." A contemporary dictionary defined "preferred" as "the thing to which it is attached has some advantage over another thing of the same character, which but for this advantage would be like the other." William C. Anderson, A Dictionary of Law: Consisting of Judicial Definitions and Explanations of Words, Phrases, and Maxims, and an Exposition of the Principles of Law: Comprising a Dictionary and Compendium of American and

ENGLISH JURISPRUDENCE 800 (1889). A racially neutral plan, which gives no race an advantage over another, was not a preference within our parlance in 1889, nor is it now. If the School District used a random selection process as a tie breaker (a flip of the coin, for example), we would not, in common parlance, describe the selection as a "discrimination" or "preference." The concept of an *advantage* given to one over another is integral to the definition of "preference." Because the School District's open choice tie breaker applies equally to members of all races, it may limit minorities and nonminorities alike, and it cannot be said to be preferential based on race.

The meaning of "discriminate against" is less clear. "Discriminate" generally has two meanings in law: to distinguish between and to show prejudice against. One dictionary defines "discriminate" as either "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit <[discriminate] in favor of your friends> <habitually [discriminate] against a certain nationality>." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 648 (1993). Alternately, the same dictionary defines "discriminate" as "to distinguish (as objects, ideas, or qualities) by discerning or exposing their differences." *Id.* The first definition supports the School District's interpretation of the initiative; the second supports PICS.

We conclude that RCW 49.60.400 is subject to more than one interpretation and turn to other sources of authority to aid interpretation. When interpreting RCW 49.60.400 as an average informed Washington State voter would have when it was proposed as I-200, we must consider our longstanding commitment to the principle that education is a paramount duty of the State. Our courts have repeatedly defined basic education broadly to include preparing students for citizenship and to succeed in the world. *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 517, 585 P.2d 71 (1978). Further, there is considerable evidence that a segregated education is an inferior education.

The average informed voter would be aware of the distinctions drawn between reverse discrimination and race

neutral balancing programs sometimes referred to as "stacked deck" and "reshuffle" programs. Subsection (3) of the statute suggests that some race conscious decisions or actions by the State would be permitted. We agree with the School District that the average informed voter would have believed that I-200 prohibited only reverse discrimination where a less qualified person or applicant is given an advantage over a more qualified applicant. An average informed voter would understand that racially neutral programs designed to foster and promote diversity to provide enriched educational environments would be permitted by the initiative.

Third, where the court finds that a law is susceptible to multiple interpretations, the standard tools of statutory construction apply to determine the voter's intent, including resorting to extrinsic sources. *W. Petroleum Imps., Inc v. Friedt*, 127 Wn.2d 420, 423, 899 P.2d 792 (1995). "[S]tatements contained in the official voters pamphlet also may be considered to ascertain the collective purpose and intent of the people." *State v. Thorne*, 129 Wn.2d 736, 763, 921 P.2d 514 (1996) (citing *Hi-Starr, Inc.* v. Liquor Control Bd., 106 Wn.2d 455, 722 P.2d 808 (1986)).

The proponents of the initiative's own ballot statements provide strong support for our conclusion. The proponents included prominently a statement limiting the reach of I-200:

### WHAT INITIATIVE 200 *WON'T* DO

Initiative 200 does not end all affirmative action programs. It prohibits *only those programs that use race or gender to select a less qualified applicant over a more deserving applicant* for a public job, contract or admission to a state college or university.

STATE OF WASHINGTON VOTERS PAMPHLET, GENERAL ELECTION 14 (Nov. 3, 1998) (Statement For I-200) (emphasis added). Given this language, an average voter would have understood that I-200 does not ban all affirmative action programs, and would prohibit only the type of affirmative action we have described as "reverse discrimination" or "stacked deck" programs.

Other ballot statements bolster our interpretation. The official ballot explanatory statement said in part: "The measure does not define the term 'preferential treatment,' and does not specify how continued implementation or enforcement of existing laws would be affected if this measure were approved. The effect of the proposed measure would thus depend on how its provisions are interpreted and applied." *Id.* at 16. This would have put the reasonably informed lay voter on notice that at least some "preferential treatment" may be allowed based upon interpretations and applications.

PICS correctly notes other ballot statements which support its interpretation. For example, the Statement For I-200 is headed: "Our Laws Should Be Colorblind." *Id.* at 14. Arguably, anything that takes race into account is not colorblind. However, the Statement For I-200 goes on to say "[b]ut instead of *ignoring race,* the government uses it through the use of *racial quotas, preferences and set-asides." Id.* (emphasis added). Thus, the emphasis is again placed upon instances of "reverse discrimination," such as college quotas and minority set asides. The general statement, "Our Laws Should Be Colorblind," certainly does not overcome the specific declaration, "It prohibits *only those programs that use race or gender to select a less qualified applicant over a more deserving applicant." Id.*

Finally, PICS argues that we should follow the interpretations given by courts to California's Proposition 209. We find the analytical frameworks and analysis of all of our sister courts useful, but we do not find the comparisons between I-200 and Proposition 209 compelling. First, and critically, although very similar in language, Proposition 209 did not contain the language found in subsection (3):

> (3) This section does not affect any law or governmental action that does not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin.

RCW 49.60.400; *compare* CAL. CONST. art. I, § 31 (Proposition 209 codified). Since this language strongly suggests

that I-200 would not prohibit all government acts cognizant of race, the language of I-200 is strikingly different from the language of Proposition 209. Second, the history of California, and in particular the history of its constitution, civil rights legislation, and California courts' jurisprudence in the field of education and civil rights, differs from that of Washington. *See generally* Neil S. Hyytinen, Comment, *Proposition 209 and School Desegregation Programs in California*, 38 SAN DIEGO L. REV. 661 (2001). California has no equivalent to our seminal *Seattle School District No. 1*, 90 Wn.2d at 496. Further, I-200 and Proposition 209 play different roles structurally. Proposition 209 is an amendment to the constitution of California. I-200 was proposed legislation, subject to the constitution of the State of Washington and the underlying principles of article IX, section 1 which mandates as paramount the duty to provide an education to impress upon our children the principles of morality, truth, and justice; the critical skills needed in the modern world to equip our children for their roles as citizens and potential competitors in the market as well as the marketplace of ideas. *See Seattle Sch. Dist. No. 1*, 90 Wn.2d at 517-18. Third, the ballot statements for Proposition 209 and I-200 are markedly different. The ballot statement for Proposition 209 did not have the illuminative language contained in the Statement For I-200 that, "Initiative 200 does not end all affirmative action programs. It prohibits only those programs that use race or gender to select a less qualified applicant over a more deserving applicant . . . ." Fourth, the decisions relating to Proposition 209 relied upon by PICS were published after Washington voters cast their ballots on I-200 and could not have influenced their understanding of the issues presented by I-200. The only cases decided before the vote on I-200 lend support to the proposition that Proposition 209 did not apply to school desegregation programs. *See Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 707 n.16 (9th Cir. 1997) (Proposition 209 does not apply to school desegregation programs); *cf. Kidd v. California*, 62 Cal. App. 4th 386, 72 Cal. Rptr. 2d 758, 761 (1998).

We

conclude that RCW 49.60.400 prohibits reverse discrimination where race or gender is used by government to

select a less qualified applicant over a more qualified applicant. It does not prohibit the Seattle School District's open choice plan tie breaker based upon race so long as it remains neutral on race and ethnicity and does not promote a less qualified minority applicant over a more qualified applicant.

CONCLUSION

We hold that the open choice plan's use of a racially cognizant tie breaker does not violate RCW 49.60.400. The School District's open choice plan does not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin as meant by law. To the extent the tie breaker is race conscious, it furthers a core mission of public education: to make available an equal, uniform and enriching educational environment to all students within the district.

While we do not reach the constitutional question, we note that article IX imposes on the State the mandatory and paramount duty to provide an education that prepares students for citizenship. This may require positive steps to provide a diverse, culturally rich and racially integrated educational experience.

We, therefore, answer the certified question in the negative, and return the case to the federal court for further proceedings consistent with our resolution of the questions of Washington law.

JOHNSON, IRELAND, BRIDGE, and OWENS, JJ., and SMITH, J. PRO TEM., concur.

MADSEN, J. (concurring) — The majority stretches to read ambiguity into RCW 49.60.400. I believe the dissent correctly concludes the terms "discriminate" and "preference" in the statute are not ambiguous. The only reasonable interpretation of "discriminate" in the context of this stat-

ute is to treat a person or class less favorably than another without regard to individual merit. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 648 (1993). Granting preferential treatment means to provide some advantage to some person or group not available to others. *See* majority at 686. These two terms represent two sides of the same coin; the statute prohibits both more favorable and less favorable treatment on the basis of a person's or group's race.

However, while I agree with the dissent's conclusion that there is no ambiguity in the statute respecting these terms, I do not agree that the dissent's conclusion follows. In my view, the Seattle School District's open school plan, including its tie breakers, does not favor or disfavor any person or group on the basis of race. All individuals and groups of a particular race are treated the same as those of another race, with the goal of mirroring the community's diversity in the schools. Sometimes that means that an African American student will prevail in a particular tie breaker situation, and sometimes that means a Caucasian, or Asian, or other racially classified individual will prevail. No particular race is singled out for preferential treatment, and no particular race is discriminated against.

I would find that the statute is unambiguous and that the Seattle School District's open school plan, including its second tie breaker providing for consideration of race, does not violate RCW 49.60.400. Accordingly, in response to the federal court's certified question, I would answer "no," the Seattle School District's use of a racial tie breaker to determine high school assignments does not "discriminate against, or grant preferential treatment to, any individual or group on the basis of race . . . color, ethnicity, or national origin in the operation of . . . public education" in violation of RCW 49.60.400(1).

I concur in the result reached by the majority.

ALEXANDER, C.J., concurs with MADSEN, J.

SANDERS, J. (dissenting) — The Court of Appeals for the

Ninth Circuit certified the following question of Washington law to this court:

> By using a racial tiebreaker to determine high school assignments, does Seattle School District Number 1 "discriminate against, or grant preferential treatment to, any individual or group on the basis of race, . . . color, ethnicity, or national origin in the operation of . . . public education" in violation of Initiative 200 (I-200), codified at Washington Revised Code § 49-.60.400?

Order at 5-6 (U.S. Court of Appeals, D.C. No. CV-00-01205-BJR (9th Cir. June 17, 2002)). I posit a plain language analysis of the statute requires an affirmative answer.[11]

We interpret initiatives based on the same rules of construction we apply to statutes passed by the legislature. *State v. Thorne*, 129 Wn.2d 736, 762, 921 P.2d 514 (1996).

---

[11] Although we are faced with a legal issue, making facts beside the point, I must express my fundamental disagreement with the majority's assertion that the Seattle School District is in any way "segregated." *Webster's Third New International Dictionary* (1993) defines "segregated" as "set apart or separated from others of the same kind or group" and "restricted to members of one group or esp. one race by a policy of segregation." *Id.* at 2057. There are no schools in the Seattle School District that conform to that definition. The following chart provides the racial constitution of Seattle public high school students in 2001. *See* Br. of Appellant, app. A.

| School | white | black | Asian | Latino | Native American |
|---|---|---|---|---|---|
| Ballard* | 62.5% | 8.9% | 14.7% | 9.6% | 4.3% |
| Chief Sealth | 31% | 18% | 27% | 21% | 3% |
| Cleveland | 10% | 35% | 43% | 10% | 2% |
| Franklin* | 19.8% | 34.6% | 39.3% | 5.5% | 0.8% |
| Garfield* | 47.2% | 34.7% | 12.5% | 4.4% | 1.1% |
| Ingraham | 30% | 19% | 38% | 9% | 4% |
| Nathan Hale* | 60.8% | 12.1% | 17.4% | 6.4% | 3.3% |
| Rainer Beach | 8% | 52% | 30% | 8% | 2% |
| Roosevelt* | 54.8% | 6.7% | 26.8% | 8.7% | 3% |
| West Seattle | 47% | 15% | 26% | 10% | 2% |

As this chart indicates, Seattle is hardly a segregated school district.

* Oversubscribed Seattle high schools indicating diversity of student body without use of racial tie breaker.

"[W]here the language of the enactment is plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is *not* subject to judicial interpretation." *Id.* at 762-63 (emphasis added). We read initiatives not as attorneys would, but " 'as the average informed lay voter would read [them].' " *State v. Brown*, 139 Wn.2d 20, 28, 983 P.2d 608 (1999) (quoting *W. Petroleum Imps., Inc. v. Friedt*, 127 Wn.2d 420, 424, 899 P.2d 792 (1995)).

RCW 49.60.400(1) provides in relevant part:

> The State shall not *discriminate against*, or *grant preferential treatment to*, any individual or group on the basis of race . . . in the operation of . . . public education . . . .

(Emphasis added.) To discriminate against means to treat one person or class less favorably than another without regard to individual merit. Majority at 686. To grant preferential treatment is to provide an advantage to some person or group not available to others. Majority at 685. Clearly, providing certain students a place at an oversubscribed school, while turning others away on racial grounds is an example of both preferential treatment and invidious discrimination. Because race is the sole factor to determine which students will prevail, the racial tie breaker necessarily runs afoul of the statute. Yet the majority ignores the obvious through a tortured reading of the statute and an unwarranted reliance on extrinsic evidence.[12]

Similarly the majority creates ambiguity where there is mere redundancy and conveniently concludes subsection (3) permits some race-cognizant governmental actions. Majority at 684-85. Subsection (3) provides the statute "does not affect any law or governmental action that does not discriminate against, or grant preferential treatment to, any

---

[12] Even if it were appropriate to take into account the *Voters Pamphlet* as extrinsic evidence of the voters' intent, it is clear from the statement in support of the initiative the voters intended "our laws [to] be colorblind," and to prohibit the use of "racial quotas, preferences and set-asides." Excerpts of the R. at 176. The Seattle School District's racial tie breaker is precisely the type of governmental action the voters sought to prohibit.

individual or group on the basis of race, sex, color, ethnicity, or national origin." RCW 49.60.400(3). That section is merely the inverse of subsection (1), which provides: "The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." RCW 49.60.400(1). The majority justifies its departure from reason by claiming that to recognize a redundant provision would be to "read the initiative as if words did not exist." Majority at 685. But that is precisely what is required of equivalent propositions.[13] *See, e.g., In re Disciplinary Proceeding Against Kuvara,* 149 Wn.2d 237, 66 P.3d 1057 (2003) (discarding redundant factors of a multifactor test).

Apparently under the impression the statute's exclusive purpose is to eradicate reverse discrimination against whites,[14] *see* majority at 678, both the majority and the concurrence conclude the racial tie breaker does not violate the statute because it applies equally to whites and nonwhites.[15] Majority at 686; concurrence at 691. But "[e]qual-

___

[13] It is one thing to quibble over the classification of a specific term within a general category. *See, e.g., Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles,* 148 Wn.2d 224, 273, 59 P.3d 655 (2002) (Alexander, C.J., dissenting) ("If 'fraternal organizations' means the same as 'club,' then the phrase 'including fraternal organizations' would be redundant. Therefore, to avoid redundancy we must begin with the assumption the two terms are *not* the same."), *cert. denied,* 538 U.S. 1057, 123 S. Ct. 2221, 155 L. Ed. 2d 1107 (2003). It is quite another matter to define *identical clauses* differently because their redundancy offends the senses.

[14] The majority's selective examination of the *Voters Pamphlet* omits reference to the Rebuttal of Statement Against I-200, which states: "the government should not use race or gender to treat applicants for employment or education differently. Why? Because *all* Americans deserve protection from race or sex discrimination. That's the principle at stake in this election." STATE OF WASHINGTON VOTERS PAMPHLET, GENERAL ELECTION 14 (Nov. 3, 1998). Clearly *"all* Americans" includes Americans of all races.

[15] The majority upholds the Seattle School District's racial tie breaker as legitimate means of achieving "diversity" in our public schools (majority at 689-90), yet it conceives of racial diversity in simplistic terms as a dichotomy between white and nonwhite, as if to say all nonwhites are interchangeable (majority at 680-81, 685-86). As a theory of racial politics, this view is patently offensive and as a policy to promote racially diverse schools, wholly inadequate.

izing injustice does not cure it." *Seeley v. State*, 132 Wn.2d 776, 815, 940 P.2d 604 (1997) (Sanders, J., dissenting). RCW 49.60.400 prohibits preferential treatment on the basis of *any* race. The fact the procedure may provide preferential treatment to one race in one instance and to another in a subsequent instance does not render it racially *neutral*, but rather unlawful in *both* instances.

Our majority also claims the statute is ambiguous because the term "discriminate" has two meanings, to distinguish between and to show prejudice against. Majority at 686. Very true. But the statute plainly states it is unlawful to discriminate *against* individuals or groups on the basis of race. Thus, the alternative definition of "distinguishing between" does not come into play. Only if the language of the statute is ambiguous may the court infer the collective intent of the people from the general purposes and structure of the statute or, failing that, from statements contained in the official *Voters Pamphlet. In re Pers. Restraint of Williams*, 121 Wn.2d 655, 664, 853 P.2d 444 (1993); *Thorne*, 129 Wn.2d at 763. Because RCW 49.60.400 is facially clear and unambiguous, we have no license to construe it further. Hence, the majority's artful interpretation—conjured from statements in the *Voters Pamphlet*—has no basis in law.

I therefore respectfully dissent.

Reconsideration denied September 2, 2003.