[No. 54213-3-I. Division One. November 15, 2004.]

BELLEVUE PACIFIC CENTER CONDOMINIUM OWNERS ASSOCIATION, *Respondent*, v. BELLEVUE PACIFIC TOWER CONDOMINIUM ASSOCIATION, *Appellant*, BELLEVUE PACIFIC CENTER LIMITED PARTNERSHIP, ET AL., *Respondents*.

---

*A. Shawn Hicks*; and *Philip A. Talmadge* (of *Talmadge Law Group, P.L.L.C.*), for appellant.

*Scott E. Feir* and *Scott B. Easter* (of *Montgomery Purdue Blankinship & Austin*), for respondent Bellevue Pacific Center Condominium Owners Association.

*Henry C. Jameson* (of *Jameson Babbitt Stites & Lombard, P.L.L.C.*), for respondents Bellevue Pacific Center Limited Partnership, et al.

¶1 GROSSE, J. — Nothing in the statutory scheme of the Washington Condominium Act, chapter 64.34 RCW, prevents a condominium declarant/partnership from owning the majority of the units and thus exercising majority control over a condominium association. Further, in order to create a master association it must be created by the declaration. The arguments of the Bellevue Pacific Tower Condominium Owners Association to the contrary were properly rejected by the trial court, and the orders on summary judgment are affirmed.

## FACTS

¶2 Bellevue Pacific Center (Center) is a condominium. It was created by the Bellevue Pacific Center Limited Partnership (partnership) which recorded declaration and covenants, conditions, restrictions and reservations (declaration) for the Center. The Center's Condominium Association (Center Association) conducts the Center's affairs. The Center is a high-rise, mixed-use complex in downtown Bellevue. The declaration for the Center created three separate units including one comprised of a tower of 171 residential units of various sizes and worth, a unit of commercial office and retail spaces, and a parking garage unit. The separate residential condominium known as the Bellevue Pacific Tower Condominium (Tower) is contained

within the Center. The partnership created the Tower by recording a separate declaration. The Tower Condominium Association (Tower Association) controls the residential tower's affairs. Thus, there is a condominium within a condominium. The partnership has owned the commercial and garage units since declarations were filed for the Center and the Tower.

¶3 The Center's declaration twice states that votes in its association are allocated equally among the three units comprising the Center: one unit, one vote, or a total of three votes. The declaration indicates that "[c]ommon [e]xpense[s]" are to be allocated based on square footage. The partnership admits the major decisions concerning the operation of the Center require two of the three unit votes and that it initially owns two of the three units. But the partnership points out that eventually this may not be so.

¶4 The Tower's declaration establishes the Tower Association. The declaration assigns voting rights in the Tower Association based on the declared value of each unit; however, common expenses are allocated among the Tower units based on square footage. The declaration for the Tower includes a provision establishing a period of declarant control and indicates a time when the declarant necessarily had to give up control of the Tower. The relationship between the Center and the Tower was fully disclosed to each person who purchased a residence in the Tower.

¶5 By a typical vote of two to one, the Center Association's board divided expenses and assessed the three units. Members of the Tower Association believed they were being overcharged and refused to pay the Center Association's assessment. The Center Association filed suit to collect the Tower Association's share of the overdue assessment. In response, the Tower Association filed an answer and counterclaim against the partnership and its affiliate, the management company. The pleadings alleged the partnership and the management company mismanaged the Center and

assessed improper charges against the Tower Association. These claims were resolved by settlement.

¶6 But also included in the Tower Association's pleadings was a claim for declaratory judgment seeking a declaration that the voting rights allocation set forth in the Center's declaration violated the Washington Condominium Act (WCA or Act), RCW 64.34.010-.920. The partnership moved for partial summary judgment dismissing the claim. The trial court granted the motion. The Tower Association briefed an additional issue not directly addressed in the pleadings, claiming the Center Association was a master association under RCW 64.34.276, thus providing only members of the Tower Association with the right to vote for directors of the Center. If the Center Association is deemed a master association, the residential homeowners gain control of the Center's board. The partnership moved for partial summary judgment on this claim and the trial court granted it as well.

¶7 The Tower Association moved for reconsideration of the first order on summary judgment, which dismissed its claim that the voting rights allocation was illegal. The motion was denied.

¶8 The Tower Association appeals the orders on summary judgment.

## ANALYSIS[1]

¶9 The overarching argument of the Tower Association is that the WCA is to be interpreted with consumer protection

---

[1] In reviewing a grant of summary judgment, this court engages in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). Where reasonable minds could reach but one conclusion from the admissible facts in evidence, summary judgment should be granted. *LaMon v. Butler*, 112 Wn.2d 193, 199, 770 P.2d 1027 (1989). This court will consider only evidence and issues called to the attention of the trial court. RAP 9.12.

in mind[2] and that the voting scheme set forth in the Center's declaration is contrary to the WCA and constitutes discrimination or is unconscionable. The Tower Association argues that the Act provides that a declarant must transfer control of the condominium to the owners and that the Center Association's voting scheme prevents the transfer of control because the declarant owns two of the three units of the Center Association.

■ ¶10 Initially, the Tower Association claims the voting scheme of the Center Association board (each of the three units gets one vote) violates RCW 64.34.224(1). That section provides:

> The declaration shall allocate a fraction or percentage of undivided interests in the common elements and in the common expenses of the association, and a portion of the votes in the association, to each unit and state the formulas or methods used to establish those allocations. Those allocations may not discriminate in favor of units owned by the declarant or an affiliate of the declarant.

The Tower Association claims the allocation of votes discriminates in favor of the declarant partnership because it owns two of the three units. But assigning one vote to each unit does not in itself discriminate, as each unit retains the same voting power regardless of ownership. There is nothing in the WCA that prevents a declarant from owning a majority of the condominium units. Nothing in the WCA or public policy requires that the residential unit owners must have control of a mixed-use building. The sunset of declarant control is not provided for in the Center condominium declaration because it is not required under the declaration and further is not required by RCW 64.34.308.

¶11 The Tower Association argues its point differently, claiming the voting scheme violates RCW 64.34.308 and .312, requiring a declarant to relinquish control to the condominium owners. Under RCW 64.34.308(4)(a), a

---

[2] *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Inv., Inc.*, 148 Wn.2d 319, 337, 61 P.3d 1094 (2002).

declarant may have a period of control during which time the declarant has the power to appoint and remove board members and officers and veto proposed action of the board or association. RCW 64.34.312 provides that *if* a period of declarant control is provided under RCW 64.34.308, then the declarant must transfer the property within a specified time following termination of declarant control.

¶12 Here, the declarant partnership did not provide for a period of declarant control for the Center Association, but provided control to the three units with equal votes. Therefore, RCW 64.34.308 and .312 do not apply to the instant facts. While true that the partnership has control, this is due to its ownership of two of the three units not due to its being the declarant. The Tower Association seemingly argues that the statutes prevent a declarant from owning majority control through voting. We disagree.

¶13 Even had there been a sunset of declarant control provided in the Center's declaration, nowhere in the WCA is there a prohibition of a declarant owning a majority of the units. The scheme here, while certainly favoring the declarant/partnership, is not in violation of the statute. The definition contained in RCW 64.34.020(32) defines a unit owner to include a declarant who owns a unit. Under RCW 64.34.308(6), within 30 days after any declarant control is terminated, the unit owners shall elect a board of directors, at least a majority of those directors must be unit owners. That is what happened here.

¶14 The control disapproved of by statute is the unilateral ability of the declarant to appoint and remove officers as well as veto association actions. Here, the Center's declaration did not provide for such control, and the control exercised was due to its majority control of the Center Association units through ownership, not unilateral control granted by the declaration.

¶15 Second, the Tower Association claims the partnership discriminated against the residential owners through misallocation of the developer's ownership interest. RCW 64.34.224(1) provides:

The declaration shall allocate a fraction or percentage of undivided interests in the common elements and in the common expenses of the association, and a portion of the votes in the association, to each unit and state the formulas or methods used to establish those allocations. Those allocations may not discriminate in favor of units owned by the declarant or an affiliate of the declarant.

¶16 No case in Washington has described what it means to "discriminate" in favor of units owned by the developer.[3] The Tower Association claims that by looking to the totality of the management arrangements for the Center, the developer established a voting scheme for the Center Association that is biased in favor of the developer's ownership interests; thus the residential homeowners are necessarily discriminated against.

¶17 However, the Center's declaration allocates one vote to each unit. It provides that common expenses are to be shared in proportion to the square footage of the units. Nothing in the allocation is illegal or improper. The statute permits the declarant to allocate votes by size, value, and number of units or other appropriate basis.

¶18 The comment to the WCA as well as the uniform act approves of an allocation scheme similar to the one here; votes assigned equally to each unit and expenses divided proportionately according to size.

1. RCW 64.32 [the former Condominium Act] requires a single common basis related to the "value" of the units to be used in the allocation of common element interests, votes in the association, and common expense liabilities. This Act departs radically from such requirements by permitting each of these allocations to be made on different bases, and by permitting allocations which are unrelated to value.

Thus, all three allocations might be made equally among all units, or in proportion to the relative size of each unit, or on the

---

[3] See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 149 Wn.2d 660, 686, 72 P.3d 151 (2003) (quoting Webster's Third New International Dictionary 648 (1993) (two definitions provided for "discriminate" or "discriminate against," here, " 'to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit.' ")).

basis of any other formula the declarant may select, regardless of the values of those units. Moreover, "size" might be used, for example, in allocating common expenses and common element interests, while equality is used in allocating votes in the association. This section does not require that the formulas used by the declarant be justified, but it does require that the formulas be explained. The sole restriction on the formulas to be used in these allocations is that they not discriminate in favor of the units owned by the declarant or an affiliate of the declarant. Otherwise, each of the separate allocations may be made on any basis which the declarant chooses, and none of the allocations need be tied to any other allocation.[4]

But it is the last sentence of RCW 64.34.224(1) that the Tower Association raises, that there can be no discrimination in favor of units owned by the declarant. But as long as all units have the same voting rights and bear the same share of common expenses *regardless* of who owns them, there is no discrimination in favor of units owned by the declarant.

¶19 Implicit in the Tower Association's argument under RCW 64.34.224 is the assumption that there never should have been separate condominiums for the Tower and the Center. But the WCA does not require this and there is no violation of the statute through discriminatory voting other than the usual "majority wins," which is necessarily a type of discrimination, but it is not illegal.

¶20 Next, the Tower Association claims the Center Association's voting scheme is unconscionable under RCW 64-.34.080 because it allows a declarant to retain control of an association in contravention of the WCA's clear intent to transfer control to the condominium owners. Again, the Center's declaration did not authorize a period of declarant control. The Center has always been subject to a one unit, one vote form of board governance. Control has always been vested in the three unit owners, even though initially the partnership/declarant controlled the Tower units that later were turned over to the homeowners association.

---

4 2 SENATE JOURNAL, 51st Leg., Reg. Sess., at 2061 cmt. (Wash. 1990).

¶21 Under RCW 64.34.080(2), a party raising the claim of unconscionability may present evidence as to the commercial setting of the negotiations, whether a party took advantage of another party by reason of mental or physical infirmity, inability to understand the language of the agreement, or illiteracy, as well as evidence relating to the effect of the contract or clause challenged. The Tower Association does not raise or argue any of these points, but instead argues that the contract is one of adhesion that allows the partnership to illegally retain control over the Tower unit. The Tower Association argues that because the residential unit constitutes 53 percent of the Center's square footage and 88 percent of the Center's declared value, the voting scheme allocating one vote to each of the Center units is unconscionable because it allows the Center Association to use resources provided by the residents and their association to the benefit of the declarant/partnership owned commercial and garage units.

¶22 But the declaration itself is not a contract under RCW 64.34.080. It is a document that unilaterally creates a type of real property. The declaration is not a contract that can be called unconscionable. As long as the declaration complies with the Act, neither the declarant/partnership nor the Tower unit owners may change the voting scheme except by approval of all unit owners affected by an amendment.[5]

¶23 The trial court also dismissed the Tower Association's argument that the Center Association is a "master association" under RCW 64.34.276, necessarily rejecting the Tower Association's argument that only the Tower Association members are allowed to elect the Center's board of directors under the alternatives found in RCW 64.34.276(5)(a)-(d). The Tower Association claims the trial court erred in this determination.

¶24 RCW 64.34.020(23) defines "[m]aster association" to mean "an organization described in RCW 64.34.276,

---

[5] *See* RCW 64.34.264(4).

whether or not it is also an association described in RCW 64.34.300." RCW 64.34.276(1) describes a master association as:

> (1) If the declaration provides that any of the powers described in RCW 64.34.304 [powers of a homeowners' association] are to be exercised by or may be delegated to a profit or nonprofit corporation which exercises those or other powers on behalf of a development consisting of one or more condominiums or for the benefit of the unit owners of one or more condominiums, all provisions of this chapter applicable to unit owners' associations apply to any such corporation, except as modified by this section.

¶25 The comment to this section indicates that the use of master associations was common in large or multiphased condominiums under prior acts.[6] Therefore, a declarant would set up a master or umbrella organization to provide management services for a series of condominiums. Master associations thus are entities to which other condominium associations delegate a portion of their power.

¶26 For RCW 64.34.276(1) to apply, three elements must be present: (1) the declaration of the owners' associations must provide that powers granted to them by the WCA are to be exercised or delegated to another corporation, (2) that corporation exercises those powers on behalf of the development, and (3) there are one or more condominiums. There is no doubt that the first two of these elements are not present in this case.

¶27 Because the declaration did not create a master association, the Tower Association's argument necessarily has to be that the Center Association is a de facto master association. However, RCW 64.34.276(1), the master association statute, requires that the delegation of powers to a master association appear in a declaration. Additionally, the power to make budgets and impose assessments must be delegated to a master association, unless that association is acting as a unit owners' association under RCW

---

[6] 2 SENATE JOURNAL, 51st Leg., Reg. Sess., at 2069 cmt. (Wash. 1990).

64.34.300 (organization of a unit owners' association). Even if the master association is also operating under RCW 64.34.300, it is granted the same powers. Because there is no delegation in the declaration, the declaration does not create a master association, and even if the Center Association were to be considered a master association, it has the powers to act granted by RCW 64.34.300.

¶28 The Tower Association's argument that only the resident members may elect the master association's board is not borne out by the statute. RCW 64.34.276.

¶29 The trial court is affirmed.

KENNEDY and BECKER, JJ., concur.

Review denied at 155 Wn.2d 1007 (2005).